JANET COLQUITT, as Mother and Next Friend of Lemont Colquitt, a Minor, Plaintiff-Appellee, v. RICH TOWNSHIP HIGH SCHOOL DISTRICT No. 227, Defendant-Appellant.

First District (5th Division)    No. 1—97—2563

Opinion filed August 14, 1998.

Scariano, Kula, Ellch & Himes, Chartered, of Chicago (Anthony G. Scariano and Enza I. Vellega, of counsel), for appellant.

Katten, Muchin & Zavis, of Chicago (Jonathan K. Baum and Brent E. Adams, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Lemont Colquitt, a freshman at Rich South High School (Rich South), through his mother and next friend, sought a writ of *certiorari* in the circuit court to enjoin the Board of Education of Rich Township High School District No. 227 (Board) from expelling him. The Board appeals from the court's order reversing its decision and finding that section 10—22.6 of the Illinois School Code (School Code) (105 ILCS 5/10—22.6 (West 1996)) is unconstitutional as applied to Lemont, raising as issues whether (1) the School Code is constitutionally deficient as applied in the case *sub judice* for failing to mandate the verbatim transcription of disciplinary hearings; (2) Lemont was deprived of the right to confrontation and cross-examination in violation of his due process rights; and (3) the Board's decision to expel Lemont was supported by the evidence.

On January 14, 1997, the Board entered an order expelling Lemont Colquitt from Rich South for three semesters due to gross misconduct, harassment and verbal intimidation. The Board had conducted a hearing previously and provided notice to Lemont's parents in accordance with the applicable provisions of the School Code (105 ILCS 5/10—22.6 (West 1996)).

A hearing officer appointed by the Board presided over the hear-

ing, which took place on January 9, 1997. In attendance were Lemont and his parents, their attorney, numerous witnesses, and the attorney for Rich South's administration. The hearing lasted six hours. Both oral testimony and written statements were admitted. Both attorneys were provided the opportunity to cross-examine the witnesses. Although no court reporter was present, the hearing officer prepared a 36-page report summarizing the evidence.

According to that report, Dr. Kenneth Reczkiewicz, principal of Rich South, testified that on December 11, 1996, he interviewed three students regarding an earlier verbal altercation involving Lemont. Although Reczkiewicz did not witness the actual confrontation, he spoke with each student immediately after the incident and each individually prepared, dated and signed written statements for Reczkiewicz detailing their observations. None of the students were present at the hearing; two already had withdrawn from Rich South, attending alternative schools, and the other was not reenrolled. Over a hearsay objection by Lemont's attorney, the statements of the three students, Charles Williams, Bryan Gayles and Gian Rhymes, were entered as evidence.

According to the statements, on December 11, 1996, all three students were in the high school after hours to watch a basketball game. During the game, Lemont, who was accompanied by another young man, started a verbal altercation with Gian outside the gymnasium, resulting in Lemont and his companion showing Gian, Charles and Bryan guns and threatening to kill them. Immediately thereafter, Lemont and the other young man ran out of the school.

After those statements were admitted at the hearing, several witnesses testified. Enyth Preacely, a teacher at Rich South, testified at the hearing that she approached a group of students, including Gian, Lemont and another young man, standing outside the gymnasium. Immediately, she heard Lemont say to Gian, "if you take it outside you won't come back in, I'll put a cap in you," while patting his waist with both hands. Lemont's friend, whom Preacely could not identify, stated he had a gun. Although she saw no weapon, Preacely left to summon the police.

Lionel Cesar, a teacher at Rich South, testified that he approached Gian and Lemont outside the school's gymnasium while the two were exchanging loud words. Grabbing onto Gian to prevent a physical fight, Cesar heard Lemont shout, "why don't you come out. I promise you will not come back." Cesar also saw Lemont and his companion pull up their coats and gesture towards their waists as if to indicate they had weapons. Although Cesar saw no guns, he heard Lemont again say that Gian would "not come back if he stepped out" and also

heard someone in the gathering crowd shout, "there's a gun, there's a gun."

While Cesar still held Gian, Rich South teacher Lee Johnson, arriving as the altercation ended, saw two individuals walking away from the area. Knowing that the police had been called, Johnson yelled for the two to stop, but they began running and left the school through the front doors.

Also testifying at the hearing was assistant principal Margurite Martin. She conducted a follow-up investigation of the incident. Over a hearsay objection, Martin indicated that she had spoken to an unnamed student on three occasions whom she believed was a credible and unbiased witness to the incident. Although the student witnessed the incident, he was not aligned with either group and his presence at the scene was inadvertent. According to Martin, the student was frightened and would not testify for fear of retaliation. At Martin's urging, however, the student prepared a written statement which was admitted at the hearing over objection. That statement indicated that while Lemont argued with Gian, Charles and Bryan, he held a gun at a firing angle for three to five seconds after which he ran out of the high school.

A statement by Edwin Wilkins, basketball coach at Rich South, also was admitted at the hearing over objection by Lemont's attorney. Wilkins' statement detailed his observation of an argument between two students, neither of whom he knew by name, outside the gymnasium. He described one of the students, matching Lemont's description, and indicated that the student stated, "I'm packing," while lifting his shirt and gesturing towards his waistband.

At the conclusion of the school administration's evidence, Lemont was given the opportunity to present any witness testimony, statements or other evidence regarding his alleged misconduct. In his case, Lemont presented the testimony of four witnesses in addition to his own.

According to the testimony, Melissa Robinson, Stacy Blanchard and Lakia Colquitt, who is Lemont's sister, were members of the Future Business Leaders of America at Rich South and attended a meeting of that club on December 11, 1996. After the meeting, the club showed a movie and served pizza to those in attendance. The girls had invited Lemont and Mario Robinson, Melissa's 21-year-old brother, to watch the movie with them. At some point after the meeting, Gian approached Stacy, who was Lemont's girlfriend, and asked for pizza, but was told "no," and left. Gian returned again to ask Stacy for pizza. He grabbed Stacy's arm, stating, "girl, don't let me get violent with you." Lemont was present during this exchange and

told Gian to leave Stacy alone. Stacy and Lemont then left the area without further trouble.

Shortly thereafter, Lemont and Mario encountered Gian, Charles and Bryan outside the gymnasium. Lemont and Gian again began arguing, with Gian threatening Lemont and using gang gestures and slogans. Neither Lemont nor Mario carried, displayed or made threats about a gun; rather, it was Gian, a known gang member, who threatened Lemont. Immediately after the argument, Lemont and Mario left the school.

The following day, Mario, a security guard, turned himself in at the Richton Park police department for questioning. Mario gave a written statement to the police, which was admitted at the hearing, indicating that he never carried a gun, never used a gun for his job and did not display a gun at the high school.

On January 13, 1997, acting upon the report prepared by the hearing officer, the Board expelled Lemont for the remainder of the 1996-97 school year and the entire 1997-98 school year. Basing its decision on the evidence presented at the hearing, the Board did not consider the charge of possession of a weapon on school grounds against Lemont. Instead, the Board's expulsion of Lemont was based solely on the gross misconduct, harassment, and verbal intimidation allegations.

Following notice of his expulsion, Lemont filed a petition for writ of *certiorari* in the circuit court, seeking a reversal of the Board's decision on the basis that the expulsion was arbitrary, capricious and unreasonable. After granting Lemont's petition for writ of *certiorari*, the court issued a preliminary injunction staying the expulsion and allowing Lemont to remain in school. Thereafter, on June 13, 1997, the circuit court found that the absence of a transcript of the expulsion hearing denied Lemont "fundamental due process" and reversed the Board's decision. The Board filed a timely appeal of that order.

I

The Board initially claims that the circuit court erred in finding the School Code constitutionally invalid as applied to Lemont for failing to mandate the transcription of disciplinary hearings. Lemont insists that the lack of a transcript in the instant case violates his due process rights.

■ ■ A student's entitlement to a public education is a property interest which is protected by due process guarantees; therefore, it may not be taken away without adherence to minimal procedural safeguards. *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 432, 551 N.E.2d 640 (1990). Although due process envisions an

orderly proceeding wherein notice and an opportunity to be heard are afforded, procedural due process in an administrative setting does not always require application of the judicial model. *Stratton*, 133 Ill. 2d at 433. The procedural safeguards required by due process in a particular case vary, depending on (1) the significance of the private interest which will be affected, (2) the risk of the erroneous deprivation of that interest through the procedures used, and (3) the significance of fiscal and administrative burdens that the additional or substitute procedural safeguards would entail. *Mathews v. Eldridge*, 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902 (1976); *Stratton*, 133 Ill. 2d at 433. An analysis of each of these considerations leads to the conclusion that Lemont's due process rights were not violated by the lack of a verbatim transcript of the hearing.

█ Addressing the first consideration, there is no question that Lemont possesses a significant interest in the uninterrupted continuation of his education. In dispute, however, is whether the risk of erroneous deprivation of this interest would have been significantly reduced by the use of a court reporter at his expulsion hearing.

Urging the necessity of transcription, Lemont contends that the risk of erroneous deprivation of his interest is all the greater because the hearing officer is an employee of the Board, the final arbiter of the hearing. Suggesting that this relationship evidences a bias on the part of the hearing officer, Lemont insists that hearings must be transcribed to avoid potential prejudice.

Notwithstanding Lemont's argument, the idea that the mere combination of judging and investigating functions is a denial of due process has been repudiated. *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55, 416 N.E.2d 1082 (1981); *Caliendo v. Martin*, 250 Ill. App. 3d 409, 421-22, 620 N.E.2d 1318 (1993). "State administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Scott*, 84 Ill. 2d at 55, quoting *United States v. Morgan*, 313 U.S. 409, 421, 85 L. Ed. 1429, 1435, 61 S. Ct. 999, 1004 (1941). There is nothing in the record, nor has Lemont cited any particular instance, to overcome a presumption of honesty and integrity on the part of the hearing officer.

Moreover, the length and detail of the hearing summary belies any inference that the hearing officer was biased. In the instant case, the hearing officer's lengthy summary of the evidence detailed each witnesses' testimony; further, the hearing officer documented the cross-examination of each witness, at times quoting the witnesses on key issues. Importantly, the summary documents the impeachment of Rich South's witnesses through cross-examination and notes that Lemont's

attorney brought out a number of weaknesses through cross-examination, including the following: Gian's statement describing Lemont's use of the gun in Cesar's presence was inconsistent with Cesar's testimony that he saw no weapon; Johnson could not identify the two individuals running away; Cesar heard both groups of students using words such as "you won't come back in"; and neither Cesar nor Preacely saw or heard how the altercation began.

Given the detail presented, the circuit court erred in holding the lack of a transcript affected its ability to review the Board's decision. The circuit court's order, addressing the evidence presented, contained five pages of factual findings. Notwithstanding the length and detail of its own findings, the court nonetheless held that "[w]ithout a transcript, there is no evidence to support the ultimate decision of the school board." Focusing on the factual dispute in the case at bar, the court found it "impossible" to "determine where the manifest weight of the evidence rests." Both the direct testimony and the impeachment evidence were documented, providing the circuit court with sufficient evidence upon which to weigh the Board's decision. The lack of a transcript in the instant case could not have detrimentally affected Lemont's due process rights under the foregoing circumstances.

Supreme Court Rule 323 provides that, in the event that no transcript of proceeding is obtainable, a proposed report of proceeding from the best available sources, including recollection, may be filed. See 134 Ill. 2d R. 323(c); *Washington v. Smith*, 248 Ill. App. 3d 534, 537, 618 N.E.2d 561 (1993) (circuit court's finding that affidavit with six pages of testimony and a partially inaudible tape was insufficient to review school board hearing was erroneous); *Sneddon v. State Employees' Retirement System*, 69 Ill. App. 3d 992, 995-96, 388 N.E.2d 229 (1979) (use of a bystander's report in administrative hearing of pension claim obviated need for verbatim transcript).

The absence of a court reporter, in and of itself, is neither a denial of due process nor a denial of equal protection; there is no requirement to provide a stenographer's transcript in every case as long as there is some other means to allow for adequate and effective review. See *Griffin v. Illinois*, 351 U.S. 12, 100 L. Ed. 891, 76 S. Ct. 585 (1956); *People v. Hopping*, 60 Ill. 2d 246, 252, 326 N.E.2d 395 (1975). Because the hearing officer's report is sufficiently detailed to provide for adequate and effective review, Lemont was not denied due process in the instant case where the expulsion hearing was not transcribed.

For the foregoing reasons, the circuit court's order, holding that the absence of a transcript was a denial of procedural due process, was in error and must be reversed.

## II

Lemont next asserts that it was error for the hearing officer to admit, over objection, those statements made by students and teachers not testifying at the hearing, in violation of his due process right to confront and cross-examine witnesses.

■ Due process is a flexible concept determined by the nature of the interest affected and the context in which the alleged deprivation occurs. See *Mathews v. Eldridge*, 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902 (1976). The immutable minimum requisites of due process, however, are notice and a meaningful opportunity to be heard. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 84 L. Ed. 2d 494, 506, 105 S. Ct. 1487, 1495 (1985); *Goldberg v. Kelly*, 397 U.S. 254, 267-68, 25 L. Ed. 2d 287, 298-99, 90 S. Ct. 1011, 1020 (1970). The flexibility of due process is found in the type of notice which must be provided and the formality and fairness of the hearing which provides the opportunity to be heard. Lemont was entitled, therefore, at a minimum, to be given *"some* kind of notice and afforded *some* kind of hearing." (Emphasis in original.) *Goss v. Lopez*, 419 U.S. 565, 579, 42 L. Ed. 2d 725, 737, 95 S. Ct. 729, 738 (1975).

The United States Supreme Court has held that "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.'" *Goldberg v. Kelly*, 397 U.S. at 262-63, 25 L. Ed. 2d at 296, 90 S. Ct. at 1017-18, quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 95 L. Ed. 2d 817, 852, 71 S. Ct. 624, 647 (1951). Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average administrative safeguards, therefore, turns on both the nature of the private interest threatened and the permanency of the threatened loss.

To determine the nature of the proceedings and the particular procedural safeguards which need apply requires analysis of the following factors: (1) the significance of the private interest which will be affected, (2) the risk of the erroneous deprivation of that interest through the procedures used, and (3) the significance of fiscal and administrative burdens that the additional or substitute procedural safeguards would entail. See *Eldridge*, 424 U.S. at 334, 47 L. Ed. 2d at 33, 96 S. Ct. at 902; *Santosky v. Kramer*, 455 U.S. 745, 754, 71 L. Ed. 2d 599, 607, 102 S. Ct. 1388, 1395 (1982); *Stratton*, 133 Ill. 2d at 433. An analysis of each of these considerations leads to the conclusion that there was an absence of meaningful procedure at Lemont's expulsion hearing.

Unquestionably, "a student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss*, 419 U.S. at 574, 42 L. Ed. 2d at 734-35, 95 S. Ct. at 736. As long as a property interest is not *de minimis*, due process, in some form, must be accorded. *Goss*, 419 U.S. at 575-76, 42 L. Ed. 2d at 735, 95 S. Ct. at 736-37. At least in the case of 10-day suspensions, *Goss* stopped "short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Goss*, 419 U.S. at 583, 42 L. Ed. 2d at 740, 95 S. Ct. at 740. Nevertheless, the *Goss* court suggested that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Goss*, 419 U.S. at 584, 42 L. Ed. 2d at 740, 95 S. Ct. at 741.

Accordingly, Lemont's entitlement to a public education is of significance, particularly when expulsion proceedings place that interest in jeopardy for lengthy periods of time. The question remaining, therefore, concerns whether the procedures used in the instant case were sufficient to guard against the erroneous deprivation of that interest.

Lemont makes no specific claims that he was denied, at all times, the right to confront and cross-examine witnesses against him. Instead, portraying Gian Rhymes, Bryan Gayles and Charles Williams as his accusers, he claims that the admission of their statements denied him due process. Lemont was notified of the allegations and the hearing date in advance and was afforded a lengthy hearing during which he was represented by counsel; he was not, however, given the opportunity to cross-examine all witnesses against him. Although three independent witnesses were present to observe portions of the behavior and the language of Lemont, none of those witnesses were present at the inception of the confrontation. In fact, the only accusing witnesses against Lemont who allegedly observed the entire incident were not even present at the hearing. Here, the outcome of the hearing was directly dependent on the credibility of witnesses whose statements were received by the hearing officer; yet, these statements were conflicting. In such an instance, the opportunity for cross-examination is imperative.

The Board maintains, however, that the value of cross-examination in school disciplinary cases is muted by the fact that the veracity of a student account of misconduct by another is initially assessed by a

school administrator who has a particularized knowledge of the student's trustworthiness. Coupled with the fact that an expulsion hearing is not subject to all the common-law rules of evidence and procedure, the Board asserts that admission of hearsay, therefore, is not a denial of procedural due process where school officials are qualified to test students' credibility. We disagree, for in this instance, the admission of hearsay accusatory statements which also are bolstered by a school official's testimony that the proponent is "reliable," as occurred with assistant principal Martin's testimony, is a particularly egregious departure from the adversarial standard.

Although an expulsion hearing is not a judicial or quasi-judicial proceeding and, therefore, common law rules of evidence need not be transplanted wholesale, certain protections, such as from witnesses " 'motivated by malice, vindictiveness, intolerance, prejudice, or jealousy,' " must be maintained. See *Goldberg*, 397 U.S. at 270, 25 L. Ed. 2d at 300, 90 S. Ct. at 1021, quoting *Greene v. McElroy*, 360 U.S. 474, 496, 3 L. Ed. 2d 1377, 1391, 79 S. Ct. 1400, 1413 (1959). Moreover, "[a] basic tenet of our jurisprudence is that a person should receive a fair and impartial hearing, with an opportunity to offer evidence and cross-examine witnesses." *Golden Egg Club, Inc. v. Illinois Liquor Control Comm'n*, 124 Ill. App. 2d 241, 244, 260 N.E.2d 329 (1970); *Gigger v. Board of Fire & Police Commissioners*, 23 Ill. App. 2d 433, 438-39, 163 N.E.2d 541 (1959). Fundamental concepts of a fair hearing include "the opportunity to be heard, the right to cross-examine adverse witnesses and to impartiality in rulings upon evidence." *Mahonie v. Edgar*, 131 Ill. App. 3d 175, 179, 476 N.E.2d 474 (1985).

Finally, the Board contends that, because it has no powers of subpoena, "there is no way that school administrators could compel witnesses to testify at student disciplinary hearings." The mere fact, however, that the School Code does not confer subpoena powers to the Board cannot excuse noncompliance with principles of due process. See, *e.g.*, *Smith v. Miller*, 213 Kan. 1, 14, 514 P.2d 377, 387 (1973). An adjustment is required in those cases where only the witnesses' statements are available, but not the witnesses themselves.

In a similar vein, the Board asserts that the failure to protect student-witnesses' anonymity would create further violence, stigmatize the student witnesses and deter those witnesses from voluntarily providing information. Risk of retaliation might justify a school board's reliance on written witness reports in some expulsion hearings; it does not, however, warrant dependence on reports in all cases or in cases where there is no showing of a significant risk of harm. Here, with the exception of assistant principal Martin's testimony regarding the un-

named student witness's fear of reprisal, there was no evidence that any of the student witnesses were threatened or in danger if they testified. Accordingly, those witnesses' statements should not have been considered by the Board.

■ In sum, in expulsion proceedings, the private interest is commanding; the risk of error from the lack of adversarial testing of witnesses through cross-examination is substantial; and the countervailing governmental interest favoring the admission of hearsay statements is comparatively outweighed. See *Eldridge*, 424 U.S. at 334, 47 L. Ed. 2d at 33, 96 S. Ct. at 902. Evaluation of the three *Eldridge* factors, therefore, compels the conclusion that the expansive use of accusatory hearsay, as was done in the instant case, is inconsistent with and violative of due process.

Based on the foregoing, the judgment of the circuit court reversing the Board's expulsion order is affirmed. The cause is remanded to the Board for further proceedings consistent with this opinion. Because we find that Lemont was not afforded procedural due process, we need not address his contention that the Board's decision was arbitrary or capricious.

Reversed in part, affirmed in part, and remanded.

HOFFMAN, P.J., and HOURIHANE, J., concur.