2016 IL App (1st) 151151
No. 1-15-1151

THIRD DIVISION
September 29, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| M.F. BOOKER, | ) | Appeal from the Board of Education |
| | ) | of the City of Chicago. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15 0325 RS3 |
| | ) | |
| THE BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO; BARBARA BYRD-BENNETT, | ) | Final Administrative Decision |
| Chief Executive Officer; ANNE WEILAND, | ) | |
| Hearing Officer; and THE ILLINOIS STATE | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Fitzgerald Smith concurred in the judgment and opinion.
Presiding Justice Mason specially concurred, with opinion.

**OPINION**

¶ 1        Petitioner M.F. Booker appeals from a final administrative decision of the Chicago Board

of Education (the Board), which resulted in the termination of his employment as a tenured

teacher at Carnegie Elementary School (Carnegie). For the reasons that follow we confirm the

Board's decision. [1]

_____

        [1] We granted the Illinois State Board of Education's (ISBE) motion to dismiss ISBE and
Anne Weiland.

¶ 2                                    BACKGROUND

¶ 3                                 I. Dismissal Charges

¶ 4        On December 27, 2013, the Board approved five dismissal charges against petitioner. Petitioner was charged with: (1) failure to perform duties; (2) failure to act in the manner of a reasonably prudent educator in the supervision of students; (3) violation of physical integrity, which prohibits physical punishment of students; (4) violation of board resolution No. 04-0728-RS2, which prohibits corporal punishment that results in the deliberate use of physical force with a student; and (5) conduct unbecoming a Chicago public schools (CPS) employee.

¶ 5        The dismissal charges were supported by the following eight specifications:

"1. For all relevant time periods of these charges you were a teacher at Andrew Carnegie Elementary School.

2. On or about February 8, 2013, you slapped student, [J.R.], an 11 year old boy, on the back of his head causing redness and the skin to break.

3. On or about February 8, 2013, you slapped student, [C.S.], an 11 year old boy, on the back of his head.

4. On or about September 9, 2013, you grabbed student [F.W.], a 12 year old boy, by his neck, slammed his head against the chalkboard and escorted him by the neck into the bathroom to talk to him.

5. On or about September 18, 2013, you grabbed student [F.W.], around his neck, slammed him against a locker and then walked away.

6. On or about October 29, 2013, you grabbed student [M.F.], a 13 year old boy, by the front of his shirt, pulled him out of his seat and into the hallway, in response to him not having his homework for class.

7. On or about October 29, 2013, you stated to student [M.F.] and/or to the entire class '[d]on't ever tell anybody that you're scared of me or it's going to be ugly. I'm not trying to make you all scared of me. I'm trying to make you respect me,' or words to that effect.

8. Your misconduct has placed CPS, Carnegie, and Carnegie's staff and students in a bad light."

The notice of the charges and specifications further concluded: "Based on the above specifications, dismissal is warranted based upon your irremediable conduct."

¶ 6                                   II. Dismissal Hearings

¶ 7        Petitioner's dismissal hearing occurred on June 18, 2014, and September 24, 2014. The Board's chief executive officer presented the following as witnesses: J.R., an 11-year-old student; L.C., the father of J.R.; F.W., a 12 year-old student; J.W., the mother of F.W.; M.F., a 13 year-old student; C.W., the mother of M.F.; Docilla Pollard, the principal at Carnegie; and Jennifer Detwyler, an investigator for the Board's law office. Petitioner presented Kelly Shepard, a teacher at Carnegie, and testified on his own behalf.

¶ 8                                          A. J.R.

¶ 9        J.R., a student in petitioner's classroom, testified that on February 8, 2013, he and another student were playing in the hallway and one of them stepped on a milk carton causing it to burst. J.R. testified that when petitioner arrived, petitioner hit both him and the other student on the back of the head. J.R. testified that he told petitioner not to touch him and then petitioner grabbed him by the neck and took him to the bathroom to talk. J.R. waited two days before he told his father about the incident.

¶ 10                                         B. L.C.

¶ 11        L.C. testified that he is J.R.'s father. L.C. testified that on or around February 8, 2013, he noticed a scratch on J.R.'s neck and inquired as to how it happened. J.R. told him he was playing in the hall and petitioner "smacked him upside his head" and told J.R. to come into the classroom. L.C. took a photo of the scratch and testified that it looked worse in person. J.R. told L.C. that he told petitioner not to touch him and then petitioner grabbed J.R. by the neck and walked him to the boys' bathroom. L.C. called the police and there was a meeting with the principal, the police officer, J.R., and L.C. L.C. filed a police report but did not file a criminal complaint. L.C. further testified that petitioner called him and told him that petitioner would never put his hands on any student in the future.

¶ 12                          C. F.W.

¶ 13        F.W., another student in petitioner's classroom, testified that on September 9, 2013, he and a classmate, M.F., were throwing things in the classroom and when petitioner returned to the classroom from the hallway, petitioner was informed of the incident and grabbed M.F. by his hair and neck and threw him out of the classroom. F.W. testified that petitioner grabbed him by the neck and slammed his head against the bulletin board, and then threw him out of the classroom. F.W. further testified that he became angry and started crying and petitioner took him to the bathroom and apologized.

¶ 14        F.W. further testified that several days after the first incident, the students were lining up to go to lunch and recess and F.W. ended up in the girls' line without being aware of it. Petitioner told F.W. to go into the boys' line and as F.W. was walking slowly to his place in line petitioner grabbed him by the neck and slammed his head into the lockers. F.W. then went to the office and called his mother and was sad, embarrassed and crying.

¶ 15                          D. J.W.

¶ 16    J.W., F.W.'s mother, testified that F.W. came home from school very upset and embarrassed on or around September 9, 2013, and told her he was throwing things in the classroom, and in response, petitioner grabbed him by his neck and slammed him into a bulletin board. J.W. told F.W. to stop misbehaving, but that he was to tell her if petitioner ever put his hands on him again. About 10 days later, F.W. called from school, and reported that petitioner had put his hands on him when he mistakenly was in the girls' line for recess. F.W. told her that petitioner grabbed him around the throat and slammed him into a locker causing bruises. J.W. observed the bruises on F.W. and took two photos of him that same evening. The photos were admitted into evidence. The photos showed bruising of her son's upper shoulder and chest. J.W. spoke with petitioner and the assistant principal a few days after this incident. Petitioner told her that his actions were his policy with behavior problems by students. F.W. was removed from petitioner's classroom; however, the only option that J.W. had was to enroll F.W. in a gifted program, which F.W. had trouble with and eventually, F.W. was returned to petitioner's classroom per J.W.'s request.

¶ 17                                    E. M.F.

¶ 18    M.F. testified that on September 9, 2013, he and F.W. were throwing things in the classroom while petitioner was in the hall. When petitioner returned, a fellow classmate told petitioner about the incident. Petitioner became angry and grabbed both boys by their necks and pushed them up to the front board. M.F. testified that petitioner punched F.W. in the chest and then took him to the bathroom. When F.W. returned, it appeared that he had been crying.

¶ 19    M.F. testified that on October 29, 2013, it was petitioner's policy that if you do not have your homework you need a note from a parent and he did not have one. He denied the claim that he told petitioner that another student had stolen his homework. M.F. testified that when he did

not have his homework, petitioner hit him in the back, picked him up by his neck and hair, and took him into the hallway and petitioner physically put him back into the classroom. When M.F. went home that day, he told his mother what had happened.

¶ 20                                          F. C.W.

¶ 21        C.W., M.F.'s mother, testified that M.F. told her about the incident over homework, and that petitioner had grabbed M.F. by his shirt. She testified that M.F. was upset and scared. On October 30, 2013, M.F., C.W., Docilla Pollard, the principal, and petitioner met to discuss what had happened. C.W. testified that she secretly tape-recorded this meeting and that tape was admitted into evidence. C.W. testified that petitioner admitted grabbing M.F. by the shirt and removing him from the classroom. She further testified that she requested that petitioner stop touching M.F., and petitioner replied that this was the way he maintained discipline and he was not going to change. C.W. made the request several more times and eventually petitioner said okay. M.F. was ultimately removed from petitioner's classroom and transferred to another classroom.

¶ 22                                     G. Docilla Pollard

¶ 23        Docilla Pollard (Pollard) testified that she has been the principal at Carnegie since 2012. She testified that she had implemented the CHAMPS program when she began as Carnegie's principal after speaking with the teachers and learning that student discipline was one of the teachers' biggest concerns. CHAMPS is a behavior program that helps teachers manage classroom behavior and places procedures in place to ensure the safety of the children and staff. CHAMPS was included in the Carnegie staff handbook, which stated CHAMPS behavior program protocols are implemented school-wide and must be evident in each classroom. She testified that she also included a provision in the staff handbook, reminding teachers that

corporal punishment is not tolerated. It stated in full, "[r]emember the Board of Education of the City of Chicago Rule section 6-21 states, '[n]o employee of the Board of Education may inflict corporal punishment of any kind upon persons attending the public school of the City of Chicago.' No corporal punishment." She also testified that every teacher is given a handbook upon employment at Carnegie.

¶ 24    Pollard testified that after she joined Carnegie, she began receiving complaints that petitioner was physical with the children. In each instance, Pollard was approached by a parent. Petitioner did not initiate contact with Pollard regarding any of the incidents at issue. Pollard discussed the complaints with petitioner and reported the incidents to the Department of Children and Family Services and in the Board's reporting system. The chief executive officer of the Board caused an investigation of each incident resulting in written reports.

¶ 25    Pollard testified that J.R.'s father, Mr. L.C., along with a police officer, came to the school several days after the incident between petitioner and J.R. She testified that Mr. L.C. came to the school to make a complaint and show her the scratch on J.R.'s neck. She was also provided with two pictures of J.R.'s neck. Following this meeting, Pollard reported the incident to the Board. Pollard also testified that later that day she met with petitioner, who informed Pollard that there was a fight between J.R. and another student. Pollard investigated the incident and no student described it as a fight.

¶ 26    Additionally, Pollard testified that F.W.'s mother, Ms. J.W., came to the school to inform Pollard that F.W. had come home from school and stated that he was scared of petitioner, and that petitioner had grabbed him and hit him and put his hands on him, and that it was not the first time. Pollard testified that she and Ms. J.W. then examined F.W. and she did not see any bruises, marks, or scratches. Pollard testified that Ms. J.W. did not report the first time that petitioner had

gotten physical with F.W. because Ms. J.W. thought she would correct her son, but she did inform her son that if petitioner did anything of that nature again, to immediately contact her. Pollard, per the Board's policy, made an incident report and contacted DCFS. Pollard testified consistently with J.W. that F.W. was removed from petitioner's classroom but then returned.

¶ 27    Subsequently, Pollard testified that she was made aware of an incident between petitioner and M.F. Pollard testified that Ms. C.W., M.F.'s mother, came to the school on October 29, 2013, and informed Pollard that M.F. had come home from school and told Ms. C.W. that petitioner had grabbed M.F. out of his chair, pulled him into the hallway, and pushed him against the locker because he did not turn in homework. According to Pollard, M.F. was then brought to her office and M.F. gave the same account of the incident. M.F. then left and petitioner arrived in the office. Petitioner admitted putting his hands on M.F. Petitioner stated that if M.F. came in his classroom the next day without his homework, he would do the same thing. After the meeting, Pollard contacted her superiors in the office of strategic school support services and followed up with an e-mail regarding advice on her next steps to remove petitioner from the school. Pollard testified that she believed removal was the right thing to do because she had received three allegations against petitioner spanning two school years. After this incident, petitioner was removed from Carnegie and placed, with pay, at the network office of CPS.

¶ 28                          H.  Jennifer Detwyler

¶ 29    While considered by the hearing officer, Jennifer Detwyler's testimony does not appear to have been considered by the Board as a basis for terminating petitioner's employment. Thus, we include it only to provide an understanding of the administrative proceedings.

¶ 30    Detwyler, an investigator for Fact Finders Group, a company that investigates allegations of misconduct for the Board, testified that on September 20, 2013, she was assigned to

investigate allegations of physical abuse committed by petitioner. She testified that she interviewed petitioner on September 24, 2013, and he admitted that he grabbed F.W. and M.F. by the front of their shirts while escorting them out to the hallway. She also testified that petitioner stated that he pushed F.W. into the chalkboard and held him against the chalkboard and told him to calm down.

¶ 31    Regarding the incident when F.W. was not in the correct line for recess, Detwyler testified that petitioner stated he grabbed F.W. by the front of his shirt and put F.W. in the correct line. Regarding the incident where M.F. did not have his homework, Detwyler testified that petitioner stated he grabbed M.F. by the front of his shirt collar and pulled M.F. from his seat and pushed M.F. into the hallway. Detwyler stated that she submitted her investigative memorandum to the head of investigations with the Board.

¶ 32    I. Kelly Shepard

¶ 33    Kelly Shepard (Shepard), a teacher at Carnegie, testified on petitioner's behalf. She testified that she was a teacher at Carnegie for the last seven years and she was a middle school math teacher. Shepard testified that she would have students talk with petitioner if they were misbehaving. She opined that petitioner was good with classroom management. She further testified that she had never observed petitioner slap a student, grab a student by the collar, or grab a student by their neck and that petitioner was a compassionate teacher concerned with the whole student, their academics, as well as their character.

¶ 34    J. M.F. Booker

¶ 35    Petitioner testified that he was an elementary school teacher with the CPS since 2002. He began teaching at Carnegie in 2006. Petitioner has a master's degree in education and became a

Golden Apple nominee for excellence in teaching and discipline. While at Carnegie, petitioner taught 4th, 5th and 7th grades.

¶ 36    Petitioner testified that in February 2013, J.R. and Cameron had a serious fight, and he grabbed J.R. by the left bicep and walked him to the bathroom to calm J.R. down. Petitioner did not observe any bruises or other marks on J.R. Petitioner testified that Pollard told him to be careful not to touch his students in that way. J.R. remained in petitioner's classroom the rest of the school year.

¶ 37    Petitioner testified that on September 9, 2013, he entered his classroom to be informed that F.W. and M.F. had been throwing crayons at each other. Once informed, petitioner requested that F.W. and M.F. exit the classroom. M.F. complied but F.W. became irate and started yelling and balling his fists. Petitioner testified that he grabbed F.W. by the upper arm and moved him to the chalkboard, and then moved him to the hallway. Petitioner also testified that he eventually took F.W. to the bathroom to calm him.

¶ 38    Petitioner testified that on September 18, 2013, F.W. was in the wrong line going to recess and when F.W. was told to get in the correct line, F.W. responded by telling petitioner that his breath smelled bad. Petitioner told F.W. to get out of line and remain behind while the rest of the students continued to recess; however, F.W. tried to remain with the other students. Petitioner testified that he grabbed F.W. by the upper arm and F.W. snatched it away. F.W. then said, "[d]on't touch me. My mother told me that if you touch me again, she would get you fired." Petitioner told F.W. he could go to the office and call his mother. F.W. then went to the office. Petitioner testified that after that incident he met with Ms. J.W. and the assistant principal. During that meeting Ms. J.W. informed petitioner that F.W. accused him of grabbing F.W., hitting F.W., and that F.W. was afraid of petitioner. The next day Ms. J.W. called petitioner to

tell him that F.W. admitted that some of the things F.W. had told her were not true. F.W. was removed from petitioner's classroom but eventually returned after the school received a written note from Ms. J.W. requesting such a move.

¶ 39    Petitioner testified that on September 29, 2013, M.F. did not have his homework. The class was required to have their homework or have a written note from a parent. M.F. did not have such a note and claimed that another student stole his homework. Petitioner stated that the other student called M.F. a liar and the situation began to escalate. Petitioner then told M.F. to step outside but M.F. did not comply. Petitioner stated that he grabbed M.F. by the arm to defuse the situation. In the hallway, M.F. was crying and eventually admitted that he did not have his homework and was concerned that the class would lose their free time at the end of the day. Petitioner has a policy of allowing free time at the end of the day if 100% of the students turn in their homework. Petitioner testified that M.F. stated he was afraid of petitioner and petitioner told M.F. that he did not want M.F. to be afraid of him and that he wanted M.F. to respect him. Petitioner testified that he told his class that he did not want anyone to fear him or be afraid of him because of a homework situation. Subsequently, petitioner met with Ms. C.W. and Pollard and admitted that he grabbed M.F.

¶ 40    Petitioner testified that he did not follow Board procedure step by step because he did not write up a report or tell anyone about these separate situations. He preferred to take care of them with the students and not have the students get in trouble. Petitioner finally testified that he never used corporal punishment on any of his students.

¶ 41               III. Hearing Officer Recommendation and Board Adoption

¶ 42    On February 2, 2015, the hearing officer issued a report containing his "Findings of Fact and Recommendations." The hearing officer found that petitioner violated the CPS employee

discipline policy, as alleged in charges 1, 2, 3, 4, and 5, and specifications 1, 2, 3, 4, 5, 6, 7, and 8, and recommended that the Board has just cause to and should dismiss petitioner. In short, the hearing officer found that the Board had proven all of the charges and specifications.

¶ 43    Concerning the allegations in specification 2, that on or around February 8, 2013, petitioner slapped student, J.R., an 11-year-old boy, on the back of his head causing redness and the skin to break, and specification 3, that on the same date petitioner slapped student, C.S., an 11-year-old boy on the back of his head, the hearing officer found that the Board had proven them by a preponderance of the evidence. The hearing officer found that the incident was triggered by students J.R. and C.S. engaging in horseplay with one another in a hallway. The hearing officer found that petitioner did in fact at least lightly slap both boys on the back of the head when separating them, and that he led J.R. to the bathroom by grabbing his neck. J.R.'s father later noticed a scratch on J.R.'s neck, and J.R. told his father it came from petitioner grabbing him by the neck to take J.R. to the bathroom after petitioner had "smacked" J.R. in the head. J.R.'s father reported it to the police and to the school. Petitioner described the incident in different terms, as a serious fight between the two boys, which he broke up by grabbing each by the upper arm, separating them, and then escorting J.R. into the bathroom so he could compose himself and stop crying. The hearing officer found that "[t]he difficulty I have with petitioner's version of the event is that no other witness agreed with him." The hearing officer found that shortly after the incident, several witnesses' recounted versions that were fundamentally inconsistent with petitioner's. The hearing officer found that specifications 2 and 3 were established by a preponderance of the evidence.

¶ 44    Concerning specification 4 allegations, that on September 9, 2013, petitioner grabbed F.W. by the neck, slammed his head against the chalkboard and escorted him by the neck into the

bathroom to talk, the hearing officer found that the general sequence of events were not in dispute, but the actions and techniques of petitioner were. Two boys, F.W. and M.F., were misbehaving while petitioner was not in the room, and petitioner took them out into the hall. Petitioner denies doing more than taking both boys by the upper arm and escorting them out of the room into the hall. Once in the hall, petitioner said he took F.W. to the boys' bathroom so F.W. could calm down. The hearing officer noted that all witnesses told the investigator that they saw petitioner take F.W. by the neck and then shove him into a whiteboard as they left the room. The hearing officer also noted that petitioner testified at the hearing that he took both boys by the arm, but the investigator reported that he told her he had grabbed them by the front of their shirts. The hearing officer found this to have obvious implications for petitioner's credibility. The hearing officer then found that the preponderance of the evidence was against petitioner on whether he grabbed these two boys by the neck and whether he pushed F.W. into the whiteboard on the way out of the room. The hearing officer found that as to whether petitioner took F.W. by the neck into the hallway to lead him into the bathroom, having concluded that this is how petitioner guided them out of the room, it seemed more likely than not that petitioner also used this technique in the hallway.

¶ 45    As to specification 5, that on September 18, 2013, petitioner grabbed F.W. around his neck, slammed him against a locker, and then walked away, the hearing officer stated that F.W. claimed that petitioner grabbed him by the neck and slammed his head into a locker twice. This incident occurred when F.W. was in the girls' portion of the line for recess and was told to get in the correct line. Petitioner testified that he told F.W. to stay behind after the other students went to recess and that he grabbed F.W. by the arm when F.W. tried to walk off. The hearing officer concluded that he did not believe that the preponderance of the evidence established that

petitioner "slammed" F.W. into a locker, but it did establish that petitioner deliberately pushed F.W. into or against a locker with some measure of force, and did so by grabbing F.W.'s neck. The hearing officer found that specification 5 had been proven.

¶ 46    Regarding specification 6, that on October 29, 2013, petitioner grabbed M.F., a 13-year-old boy, by the front of his shirt and pulled M.F. from his seat and into the hallway because M.F. did not have his homework, the hearing officer reasoned that the evidence on this point was not nearly as strong as the evidence on the other specifications but found that reasonable inferences from the record preponderate in favor of the Board's case. The hearing officer stated that M.F. claimed that petitioner hit him in the back, picked him up by his hair, and said he ought to throw him in a locker. Several other students said petitioner hit M.F. in the back. The investigator reported that petitioner admitted grabbing M.F. by the shirt collar and pulling him out of class but that petitioner also said M.F. was getting ready to fight with another student whom M.F. had falsely accused of stealing his homework. The hearing officer noted that M.F.'s version of events seemingly involved details that were absent from versions of other witnesses. The hearing officer found that M.F. was an unreliable witness. The hearing officer found that petitioner pulled M.F. from the room and that petitioner did so by M.F.'s shirt collar. The hearing officer indicated that every witness said petitioner did so and the investigator, M.F.'s mother, and the principal said petitioner admitted to doing so. Petitioner denies having said this, but the hearing officer found it impossible to credit his denial. The hearing officer found that the only question on this specification is whether petitioner reasonably believed M.F. and the other student were, in fact, about to engage in a fight. If so, policy would permit petitioner to use physical intervention to prevent it, even if his technique of grabbing by the collar was inappropriate. The hearing officer found that the evidence on this point was largely a matter of inference, since the issue was

subjective intent and motivation. The hearing officer found it significant that petitioner never raised the issue that the boys were going to fight when confronted by M.F.'s mother and the principal. The hearing officer found that the reasonable inferences from the record preponderate in favor of the Board.

¶ 47　　　　Concerning the allegations in specification 7, that on September 29, 2013, petitioner stated to M.F. and/or the entire class "Don't tell anybody that you're scared of me or it's going to be ugly. I'm not trying to make you all scared of me. I'm trying to make you respect me," or words to that effect, the hearing officer found that every student interviewed but for one, said that petitioner made a statement that was some variation of the above. The hearing officer found that the persuasiveness of this evidence was somewhat undercut by the uniformity of the student's recollections; he did find it more likely than not that petitioner made a statement to this general effect at about the time of the October incident with M.F.

¶ 48　　　　Petitioner testified that he made a statement to the class, which is markedly different from that described by the students. Petitioner stated he did not talk about students being afraid of him but made a statement about how seriously he takes homework and how it is their responsibility. The hearing officer found that the statement petitioner eventually described was different enough from the statement that the students claimed to have heard and that it was hard to ascribe the difference to the vagaries of memory. The hearing officer found that the Board was entitled to view the statement, whatever the particulars of its wording, as an effort to coerce the students and discourage them from complaining about or reporting petitioner's behaviors. The hearing officer found that the Board carried its burden of proving the allegations by a preponderance of the evidence.

¶ 49    The hearing officer concluded that petitioner was negligent under the terms of section 34-85 of the School Code (Code) and his conduct was deemed irremediable and that no written warning was required prior to dismissal under the Code and the Board would be within its legal authority to dismiss petitioner. 105 ILCS 5/34-85 (West 2012).

¶ 50    On March 25, 2015, the Board issued resolution No. 15-0325-RS3 in its opinion and order, in which it accepted the hearing officer's findings and recommendation. The Board also accepted all of the hearing officer's witness-credibility findings. The Board noted that some of the hearing officer's findings were based, in part, upon statements of students made to Board investigators, who did not testify, that were documented in investigative memoranda. The Board specifically stated it did not rely upon the statements of students who did not testify. The Board found sufficient evidence of irremediable conduct without considering those nontestifying students. The Board discussed the law and the facts of each specification in its opinion and order.

¶ 51    The Board then concluded that corporal punishment constituted grounds for dismissal without the opportunity for remediation under section 34-85 of the Code (105 ILCS 5/34-85 (West 2012)). The Board also found that conduct that in any way causes psychological or physical harm or injury to a student also does not require a written warning under the Code. The Board determined that no written warning was required before dismissal and, under the circumstances, terminated petitioner from his employment with CPS. Petitioner thereafter filed for review of the Board's decision pursuant to Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994).

¶ 52                                        ANALYSIS

¶ 53    On appeal, petitioner argues that: (1) the dismissal proceedings denied him procedural due process; and (2) the Board's determination that it had cause to dismiss petitioner was against the manifest weight of the evidence.

¶ 54    This court's review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq*. (West 2012)). See 105 ILCS 5/34-85 (West 2012). The standard of review to be applied to the agency's decision turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. *Board of Education of City of Chicago v. Illinois Education Labor Relations Board*, 2014 IL App (1st) 130285, ¶ 19. We review an agency's conclusion on a question of law *de novo. Id.*; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). A decision involving a question of fact is afforded deference and will not be reversed unless it is against the manifest weight of the evidence. *Id*. "An administrative agency's factual determinations are contrary to the manifest weight of evidence where the opposite conclusion is clearly evident." *Id*. at 204. Finally, a mixed question of law and fact asks the legal effect of a given set of facts, and we review an agency's conclusion on such a mixed question using a clearly erroneous standard. *Id*. at 205; *James v. Board of Education of the City of Chicago*, 2015 IL App (1st) 141481, ¶ 12.

¶ 55                              I.   Procedural Due Process

¶ 56    Petitioner first argues that he was denied his right to procedural due process. Whether a party's due process rights were violated during an administrative hearing is a question of law that we review *de novo*. *Board of Education of Valley View Community Unit School District No. 365-U v. Illinois State Board of Education*, 2013 IL App (3d) 120373, ¶ 40.

¶ 57    A tenured teacher has a property interest in continued employment that is protected by the principles of due process. *Board of Education of Community Consolidated School District*

*No. 54 v. Spangler*, 328 Ill. App. 3d 747, 755–56 (2002). "[D]ue process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). " '[P]rocedural due process in an administrative proceeding does not require a proceeding in the nature of a judicial proceeding' " (*Abrahamson*, 153 Ill. 2d at 92 (quoting *Telcser v. Holzman*, 31 Ill. 2d 332, 339 (1964))), but on administrative review, a reviewing court " 'has a duty to examine the procedural methods employed at the administrative hearing, to insure that a fair and impartial procedure was used' " (*Abrahamson*, 153 Ill.2d at 92-93 (quoting *Middleton v. Clayton*, 128 Ill. App. 3d 623, 630 (1984))).

¶ 58    "A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Abrahamson*, 153 Ill. 2d at 95. "If the procedures used by an administrative agency violate fundamental fairness and a party's due process rights, the appellate court should reverse the agency's decision." *Hearne v. Chicago School Reform Board of Trustees of the Board of Education*, 322 Ill. App. 3d 467, 484 (2001) (citing *Dimensions Medical Center, Ltd. v. Elmhurst Outpatient Surgery Center, L.L.C.*, 307 Ill. App. 3d 781, 795 (1999)); *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶¶ 72-78.

¶ 59                    A.   Collaboration with Hearing Officer

¶ 60    Petitioner argues that the Board's failure to collaborate with the hearing officer denied him his procedural due process rights. When the legislature amended section 34-85 to make the Board the final decision maker in teacher discipline cases, the Board was required to conduct its proceedings in a manner consistent with settled principles of law. *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, 312 Ill. App. 3d 182, 185 (2000). Although an administrative

proceeding must comply with procedural due process, such proceedings may be conducted by hearing officers who make recommendations and refer the case to a decision making board that has not personally heard the evidence. *Ruther v. Hillard*, 306 Ill. App. 3d 997, 1005 (1999). Due process may require sufficient interaction and participation between the hearing officer and the board when the evidence before the hearing officer is in conflict and the resolution of the credibility and weight of the testifying witnesses is the determining factor. *Serio v. Police Board*, 275 Ill. App. 3d 259, 266 (1995).

¶ 61    Petitioner relies on *Hearne* for the proposition that where a board that has not heard the evidence at hearing, makes new credibility determinations, procedural due process requires the board to collaborate with the original hearing officer. 322 Ill. App. 3d at 483. Petitioner argues that the hearing officer's credibility determinations were built on evidence the Board rejected, thus the Board made new credibility determinations and its failure to consult with the hearing officer violated petitioner's procedural due process.

¶ 62    The Board responds that *Hearne* is inapplicable, because the Board rejected all of the credibility determinations of the hearing officer without consulting him, whereas here, the Board accepted the credibility findings of the hearing officer. 322 Ill. App. 3d at 484. Although the Board noted that the hearing officer's findings were partially based on nontestifying students' statements, the Board stated it did not rely on those statements, and the Board reasoned that it found sufficient admissible evidence to support and accept the hearing officer's findings and recommendation to dismiss petitioner.

¶ 63    We note that in *Hearne*, it was reasoned that in rejecting the finding and recommendations of the hearing officer, the police board did not indicate that it conferred with the hearing officer or that the hearing officer participated in the board's decision. The court

concluded that in the particular factual context of that case, the record did not reflect sufficient interaction and participation of the hearing officer to satisfy procedural due process. 322 Ill. App. 3d at 484. The court reasoned that it was not saying that due process requires the commission or board to defer to the findings of a hearing officer. *Id.* "We are not saying that the hearing officer should participate in the decision making process of the board in every case or that the board should confer with the hearing officer in every case where the board rejects the recommendation of the hearing officer. However, where credibility is the determining factor and where as in this case the final decision making body reverses each and every credibility finding of the hearing officer, we believe the hearing officer should participate in the decision making process and the board should confer with the hearing officer." *Id.*

¶ 64       We further note that in *Hearne*, the court found that the police board reweighed the evidence, substituted its determination of the credibility of the witness, and substituted its judgment for that of the hearing officer. 322 Ill. App. 3d at 484. The court concluded that in the particular factual context of that case, the record did not reflect sufficient interaction and participation of the hearing officer to satisfy due process. *Id.*

¶ 65       In contrast, here, the record reflects that the hearing officer afforded petitioner a fair hearing consistent with due process where petitioner cross-examined the witnesses against him, presented evidence in his defense, and received fair and impartial rulings on evidentiary disputes. After hearing all the evidence, the hearing officer, consistent with due process submitted a signed and dated written report consisting of 36 pages, noting the charges and providing 14 pages of factual findings. The report also included a seven-page legal analysis applying the law to the facts. The hearing officer provided a detailed and well-reasoned decision, finding sufficient evidence to sustain the Board's charges against petitioner. We reach the same conclusion

regarding the Board's acceptance of the hearing officer's findings and recommendation of dismissal of petitioner. The Board issued a four-page opinion and order applying the law to the facts and a substantive discussion. We find that under the circumstances in the case at bar, where the Board deferred to the hearing officer's findings and recommendation and reviewed all the evidence and the transcripts of proceedings, that under *Hearne*, collaboration with the hearing officer was not required. 322 Ill. App. 3d at 484.

¶ 66      Petitioner next argues that the hearing officer credited out-of-court inadmissible hearsay statements of a considerable number of nontestifying students in the investigative memoranda, virtually all of whom were anonymous. Petitioner maintains that he had no opportunity to confront or cross-examine these anonymous accusers. Petitioner contends that the students' statements in the investigative memoranda were pivotal to the hearing officer's findings and although petitioner admits that the Board properly rejected most of these students' hearsay statements, the Board, nonetheless, improperly based its findings of fact and conclusions of law on the hearing officer's credibility determinations. Petitioner further maintains that the credibility determinations were made based on this inadmissible evidence, therefore, the finding of the hearing officer, imputed to the Board on its adoption of the hearing officer's credibility determinations, is a violation of his procedural due process rights. Petitioner claims that once the inadmissible hearsay statements are excluded, there is insufficient evidence to support his dismissal.

¶ 67      Petitioner also argues that the hearing officer improperly relied on the investigative memoranda to reject petitioner's testimony on each of the specifications against him. Petitioner states that the hearing officer's findings on each charge were based on witness credibility, as measured by their conformity to the investigative memoranda, which was inadmissible hearsay.

¶ 68  The Board responds that it did not rely on the out-of-court statements in the investigative memoranda. The Board contends that the record contained more than enough admissible evidence to support its findings. The Board states that it issued its own decision and set forth the admissible evidence it relied on for each of its findings. The Board points to the fact that three student victims testified about petitioner's corporal punishment of them. In addition to the students' testimony, the Board relied on photographs of the students' injuries, testimony of their parents who observed their injuries, both physical and psychological, and petitioner's own admissions in his testimony at the hearing.

¶ 69  Although a dismissal hearing is not a judicial or quasi-judicial proceeding and, therefore, common law rules of evidence need not be transplanted wholesale, certain protections, such as from witnesses " 'motivated by malice, vindictiveness, intolerance, prejudice, or jealousy,' " must be maintained. *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)). Moreover, "[a] basic tenet of our jurisprudence is that a person should receive a fair and impartial hearing, with an opportunity to offer evidence and cross-examine witnesses." *Golden Egg Club, Inc. v. Illinois Liquor Control Comm'n*, 124 Ill. App. 2d 241, 244 (1970); *Gigger v. Board of Fire & Police Commissioners*, 23 Ill. App. 2d 433, 438-39 (1959). Fundamental concepts of a fair hearing include "the opportunity to be heard, the right to cross-examine adverse witnesses and to impartiality in rulings upon evidence." *Mahonie v. Edgar*, 131 Ill. App. 3d 175, 179 (1985); *Colquitt v. Rich Township High School District No. 227*, 298 Ill. App. 3d 856, 864-65 (1998).

¶ 70  Petitioner argues that the use of the out-of-court statements of nontestifying students violated his due process right to cross-examine adverse witnesses. "Generally, procedural due process protections preclude the admission of hearsay evidence in an administrative proceeding."

*Chamberlain v. Civil Service Comm'n*, 2014 IL App (2d) 121251, ¶ 47. However, " 'where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error.' " *Abrahamson*, 153 Ill. 2d at 94 (quoting *Goranson v. Department of Registration & Education*, 92 Ill. App. 3d 496, 501 (1980)). Additionally, the strict rules of evidence that apply in a judicial proceeding are not applicable to proceedings before an administrative agency. *MJ Ontario, Inc. v. Daley*, 371 Ill. App. 3d 140, 149 (2007); *Ivy v. Illinois State Police*, 263 Ill. App. 3d 12, 19 (1994); see also 23 Ill. Adm. Code 51.60(d)(2), amended at 36 Ill. Reg. 12829 (eff. July 25, 2012) ("The hearing officer shall be the judge of the relevancy and materiality of the evidence offered and strict conformity to legal rules of evidence shall not be necessary.").

¶ 71    In support of his argument that students' out-of-court hearsay statements violated due process, petitioner primarily relies on the case of *Colquitt*, 298 Ill. App. 3d at 857. There, a student sought review of the Board of Education's decision to expel him due to a verbal confrontation between the student and three other students. *Colquitt*, 298 Ill. App. 3d at 857–58. The three other students were not present at the hearing, but their statements were admitted into evidence over objection by the student's attorney. *Id.* at 858. On appeal, the student argued that admission of the statements denied him due process by denying him the right to confront and cross-examine his accusers. *Id.* at 864. The appellate court agreed, noting: "Although three independent witnesses were present to observe portions of the behavior and the language of [the student], none of those witnesses were present at the inception of the confrontation. In fact, the only accusing witnesses against [the student] who allegedly observed the entire incident were not even present at the hearing. Here, the outcome of the hearing was directly dependent on the credibility of witnesses whose statements were received by the hearing officer; yet, these

statements were conflicting. In such an instance, the opportunity for cross-examination is imperative." *Id*.

¶ 72    Petitioner also relies on *Kimble*, 2014 IL App (1st) 123436. In *Kimble*, the tenured teacher was accused of corporal punishment of a student who did not testify at the teacher's dismissal hearing. None of the witnesses present at the hearing observed the entirety of the alleged corporal punishment. *Id*. ¶ 84. The court held that it was unjust to terminate a tenured teacher's employment without the opportunity to cross-examine her accuser, and the court cannot find that such a procedure comports with due process. *Id.*

¶ 73    Petitioner argues that here, like in *Colquitt* and *Kimble*, the outcome of the hearing was dependent on credibility determinations and there was no competent evidence corroborating the inadmissible hearsay testimony. Petitioner maintains that where credibility is dispositive, the finder of fact cannot rely on unsworn out-of-court declarations of nontestifying witnesses. Petitioner claims that the inclusion of such testimony in the investigative memoranda violated his right to confront and cross-examine the witnesses against him.

¶ 74    We find petitioner's reliance on *Colquitt* and *Kimble* inapposite. In both cases the accused had no opportunity to confront and cross-examine the accusers. Also, in both cases the admission of statements of the accusing witnesses despite the witnesses' absence from the hearing, were allowed. Here, the accusing witnesses testified and were cross-examined by petitioner's counsel. No out-of-court nontestifying students' statements were admitted. Further, the Board specifically stated in its report that it did not rely on any of the out-of-court statements of nontestifying students in its findings and decision.

¶ 75    Here, in a written decision, the hearing officer presented a thorough and well-reasoned analysis of the lengthy testimony as it related to the issue of whether the Board had proven each

of the eight specifications against petitioner. We hold that the hearing officer's findings received substantial support from the evidence. We also note that the Board specifically stated that "some of the HO's findings were based, in part upon statements of students made to Board investigators, who did not testify, that were documented in investigative memoranda. Although, the Board believes these investigative memoranda were admissible as business records, it does not rely upon the statements of students who did not testify. The Board finds sufficient evidence of irremediable conduct without considering those non-witness statements."

¶ 76        The witnesses present at the hearing were involved in the entirety of the separate situations. We find that the requirements of due process were satisfied where petitioner's attorney was able to cross-examine witnesses whose testimony was indispensible to the outcome of a hearing in which petitioner's constitutionally protected interest in continued employment was at stake. See *Abramson*, 153 Ill. 2d at 95 ("A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling on the evidence.").

¶ 77        We conclude that petitioner received a fair and impartial hearing in this case and was not denied procedural due process.

¶ 78                                2. Validity of Board's Decision

¶ 79                                A. Irremediable vs. Remediable

¶ 80        We now turn to petitioner's argument that the Board's determination that it had cause to dismiss him was against the manifest weight of the evidence because the Board misapplied its own guidelines, his conduct was not *per se* irremediable, and a warning would have cured petitioner's conduct. We disagree.

¶ 81        Petitioner contends that in each of the instances charged, students were embroiled in a physical altercation threatening harm to one another, and/or disrupting the learning environment. Petitioner maintains that in each instance he justifiably used reasonable force. Petitioner states that section 84a of the Code permits teachers to use "reasonable force as needed to maintain safety for the other students and shall provide that a teacher may remove a student from the classroom for disruptive behavior." 105 ILCS 5/34-84a (West 2012). Petitioner claims that the Board promulgated guidelines for use of reasonable force and improperly misapplied them in this case. These guidelines allow for momentary physical interventions, without prior nonphysical intervention in order to protect students or others, and in order to prevent serious property damage. The guidelines also allow for more coercive momentary physical interventions in emergency situations. Petitioner asserts that under these guidelines his physical interventions did not constitute impermissible corporal punishment.

¶ 82        Petitioner also urges that his teaching deficiencies were remediable, and that he did not receive the notice required for such deficiencies. The test is whether the conduct resulting in damage done to students, faculty or school could have been corrected had the teacher's superiors warned him. *Grissom v. Board of Education of Buckley-Loda Community School District No. 8*, 75 Ill. 2d 314, 331-32 (1979). Performance that could have been remediable standing alone becomes irremediable when combined with other conduct. *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 154 (1977). Corporal punishment is an irremediable cause for dismissal. *Lowe v. Board of Education*, 76 Ill. App. 3d 348, 355 (1979). The hearing officer's determination on remediability will not be disturbed unless contrary to the manifest weight of the evidence. *Gilliland*, 67 Ill. 2d at 153; *Carter v. State Board of Education*, 90 Ill. App. 3d 1042, 1046 (1980).

¶ 83      A tenured teacher shall not be discharged unless he or she is "given reasonable warning in writing, stating specifically the causes that, if not removed, may result in charges." 105 ILCS 5/34-85(a) (West 2012). A tenured teacher may be discharged without warning only if his or her conduct is deemed irremediable. 105 ILCS 5/34-85 (West 2012). Likewise, "[n]o written warning shall be required for conduct on the part of a teacher *** that is cruel, immoral, negligent, or criminal or which in any way causes psychological or physical harm or injury to a student as that conduct is deemed to be irremediable." 105 ILCS 5/34-85 (West 2012).

¶ 84      It is well settled that the determination of whether a cause for dismissal is irremediable or remediable is a question of fact that involves the exercise of judgment and, therefore, lies within the discretion of the fact finder. *Prato v. Vallas*, 331 Ill. App. 3d 852, 864 (2002); *Board of Education of Joliet Township High School District No. 204 v. Illinois State Board of Education*, 331 Ill. App. 3d 131, 135 (2002). The Board's findings that petitioner's conduct was irremediable will not be reversed by this court unless the decision is against the manifest weight of the evidence or the Board acted in an arbitrary or capricious manner. See *Board of Education of Sparta Community Unit School District No. 140 v. Illinois State Board of Education*, 217 Ill. App. 3d 720, 728 (1991).

¶ 85      Petitioner further argues that the hearing officer, in determining that his conduct was irremediable, did not properly apply *Gilliland*, 67 Ill. 2d at 153. We note that before the Code was amended in 1995, a two-part test applied to determine whether the conduct supporting a dismissal was to be deemed remediable or irremediable. *Id*. That two-part test analyzed (1) whether the teacher's conduct caused significant damage to students, faculty, or the school, and (2) whether the teacher would not have corrected his conduct, even if he had been issued a

written warning and a period of time for remediation. *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 163 (2006) (citing *Gilliland*, 67 Ill. 2d at 153).

¶ 86    In 1995, however, the Code was amended to include the language in section 34-85, which explicitly provides that certain types of conduct are to be deemed *per se* irremediable, thereby eliminating the need to apply the *Gilliland* test to those particular types of conduct. *Ahmad*, 365 Ill. App. 3d at 164. Under section 34-85 of the Code, a teacher's conduct that is "negligent" or "that in any way causes psychological or physical harm or injury to a student" is deemed *per se* irremediable. 105 ILCS 5/34-85 (West 2012).

¶ 87    The Board acknowledges that school staff may employ momentary physical intervention in an emergency situation; however, momentary physical interventions may only be used when other nonphysical interventions have failed to deescalate the situation or are otherwise impossible. The Board maintains that none of the situations petitioner faced required him to use a physical intervention with his students. The Board also maintains that petitioner's use of force was unreasonable. The Board asserts that the guidelines specifically prohibit staff from holding students by their necks when employing physical interventions. The Board points to the numerous situations where it was stated that petitioner grabbed students by their shirt collars and necks in contravention of the guidelines. The Board did not find that petitioner employed authorized momentary physical interventions in the instances charged because it did not find that petitioner was faced with emergency situations where he needed to stop a student from completing an act, or remove a disruptive student. The Board claims that petitioner's use of unreasonable force resulted in corporal punishment and was the irremediable cause for his dismissal. We agree.

¶ 88    The record in this case contains considerable testimony of damage to petitioner's students. There was evidence that the complained of conduct of petitioner extended over two years despite numerous parental complaints, culminating in discussions between petitioner and his superiors concerning his conduct. It seems clear that the cumulative effect of the evidence is such as to preclude a holding that the Board's findings are contrary to the manifest weight of that evidence.

¶ 89    Further, it is noted that petitioner was well aware of the policy against corporal punishment. The guidelines from the Board of Education implemented the policy by statute. The statute appears verbatim in Carnegie's staff handbook, which each teacher receives upon employment. Moreover, petitioner testified that after his altercation with J.R. and C.S., Pollard verbally warned him to be careful as far as touching students.

¶ 90    The hearing officer found evidence of psychological harm, in the feelings of sadness, embarrassment and fear that students reported. Additionally, the hearing officer found that the petitioner's conduct caused physical harm to J.R. and F.W. Under the provisions of section 34-85 of the Code, the petitioner's conduct is deemed *per se* irremediable and he was not entitled to a written warning before his dismissal. 105 ILCS 5/34-85 (West 2012). Accordingly, we find that the Board's ultimate decision to dismiss the petitioner without a written warning is not against the manifest weight of the evidence. *James*, 2015 IL App (1st) 141481, ¶ 21 (No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed to be irremediable.).

¶ 91                                    B. Arbitrary and Capricious

¶ 92    The next question is whether the Board's findings with respect to the charges against petitioner were arbitrary and capricious. Petitioner asserts that the Board failed to recognize that a teacher must maintain discipline in his classroom, which may call for momentary physical intervention. As the Board found, petitioner's use of force was unreasonable and unnecessary to maintain his student's safety and discipline. We agree and find that petitioner's attempt to demonstrate that the Board's decision was arbitrary and capricious must fail.

¶ 93    While it is probably not possible to enumerate all the kinds of acts or omissions that will constitute arbitrary and capricious conduct, the following guidelines apply. Agency action is arbitrary and capricious if the agency (1) relies on factors that the legislature did not intend for the agency to consider, (2) entirely fails to consider an important aspect of the problem, or (3) offers an explanation for its decision that runs counter to the evidence before the agency or that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983); *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505 (1988). The scope of review is narrow and the court is not, absent a clear error of judgment, to substitute its own reasoning for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

¶ 94    Under this standard, it was not arbitrary and capricious to find that petitioner slapped his students and grabbed them by their neck and/or their shirts when employing physical interventions. In fact, in one instance petitioner admitted grabbing a student by his shirt and removing him from the classroom when the student did not have his homework. Although petitioner testified that he thought a fight might start, he also testified that he did not believe that

they would fight. We find that petitioner was not faced with an emergency situation that would allow for physical intervention.

¶ 95    The Board's written findings in this case provide further evidence that the Board did not act arbitrarily. As noted above, the Board issued a well-reasoned opinion and order, applying the facts to the law, and included a substantive discussion of the evidence and the controlling legal principles. Under these facts, we reject the petitioner's contention that the Board's findings that cause for dismissal existed was arbitrary and capricious.

¶ 96    We conclude that the evidence supported the Board's determination that petitioner's actions were *per se* irremediable and a proper basis for his dismissal. We confirm the final decision and order of the Board.

¶ 97                                CONCLUSION

¶ 98    Based on the foregoing reasons, we confirm the decision of the Board.

¶ 99    Confirmed.

¶ 100   PRESIDING JUSTICE MASON, specially concurring.

¶ 101   I concur in the result reached by the majority. Under the manifest weight of the evidence standard, which applies to the Board's factual findings (*City of Belvidere*, 181 Ill. 2d at 205), there is sufficient evidence in the record to uphold the Board's determination that petitioner was guilty of irremediable conduct warranting his dismissal. Petitioner's admissions and his varying accounts of the incidents giving rise to the charges, considered in light of the other testimony and evidence, were a sufficient basis upon which the Board could conclude that the charges had been proven.

¶ 102   I write specially, however, because I believe the issue is closer than acknowledged by the majority given the weight accorded by the hearing officer to out-of-court statements by

unidentified, nontestifying students and the importance of the hearing officer's credibility determinations. As the hearing officer stated: "[T]here are five incidents alleged against [petitioner], all of which turn on credibility, at least to an extent, as he admits that all of the incidents took place but contends that they took place differently than they were described by the students."

¶ 103 The hearing officer's decision, while detailed and thorough, is replete with references to the officer's reliance on accounts of petitioner's interactions with the complaining students given to investigators by nontestifying students, which, in many instances, the hearing officer found corroborated the testifying witnesses' accounts. In some instances, this corroborating evidence appeared to tip the scale in the hearing officer's decision to credit one version of events over another. With respect to the charges involving J.R. and C.S., after noting that "[r]eports by children demand special caution," the hearing officer concluded that the fact that "at least five witnesses recounted versions that are fundamentally inconsistent with [petitioner's], persuades me that he did in fact at least lightly tap both boys on the back of the head when separating them, and that he led J.R. to the bathroom by grabbing his neck." But three of those witnesses did not testify at petitioner's hearing.

¶ 104 Likewise, regarding the incident involving M.F. and F.W., the hearing officer noted that "the student who originally reported it, [M.F.], [F.W.], and a girl in the class all told the investigator they saw [petitioner] take [F.W.] by the neck, and then shove him into a whiteboard as they left the room." But "the student who originally reported" the incident and "the girl in the class" did not testify. The hearing officer also noted regarding the incident involving F.W. being removed from the girls' line, "[a]s with the other allegations, if there is an effort to cast [petitioner] in a false light, it also includes the two students who told [the investigator] that he

did push [F.W.] into the locker, and the other student who said he did not but that he did grab [F.W.] by the neck."

¶ 105 Finally, with respect to petitioner's admonishment to the class ("Don't ever tell anybody that you're scared of me or it's going to be ugly."), the hearing officer noted that "[e]very student who was interviewed but for one said that [petitioner] made [the] statement, either to [M.F.] or to the class." The hearing officer did note that the persuasiveness of these out-of-court accounts was "somewhat undercut" by their uniformity, but the only person to testify to the substance of petitioner's statement was the investigator, who was not present when it was made. Ultimately, the hearing officer concluded that petitioner's failure to offer his version of what he actually said when he was interviewed by the investigator undercut his testimony at the hearing as to the substance of his statement.

¶ 106 I agree, as the majority concludes, that *Hearne* is distinguishable on its facts because here the Board did not reject the hearing officer's credibility findings. But it is at least arguable that, under the circumstances, the Board should have consulted the hearing officer to determine whether, if the hearsay statements of other students were disregarded, his credibility determinations would have been the same. And if the other evidence of petitioner's misconduct had been less conclusive, it is possible that this error would have required reversal because it would have impaired his right to cross-examine the witnesses against him. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992) (fair administrative hearing includes "the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence.").