2019 IL App (1st) 18-1907-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
October 29, 2019

No. 1-18-1907

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| DON HUDDLESTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Petition for Administrative Review |
| ILLINOIS STATE BOARD OF EDUCATION; | ) | from the Board of Education |
| JAMES T. MEEKS, Board Chair, in his official | ) | of the City of Chicago |
| capacity; TONY SMITH, State Superintendent, in his | ) | |
| official capacity; BRIAN CLAUSS, hearing officer; | ) | |
| BORAD OF EDUCATION OF THE CITY OF | ) | Board Order No. 18-0725-RS10 |
| CHICAGO; JANICE K. JACKSON, Chief Executive | ) | |
| Officer, | ) | |
| | ) | |
| Respondents. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We confirm the decision of the Board of Education of the City of Chicago that dismissed the petitioner's employment as a tenured teacher where the Board's finding that the petitioner struck a ten-year-old student causing him to bleed was not against the manifest weight of the evidence.

¶ 2    This appeal stems from the decision of the Board of Education of the City of Chicago (the

Board) to terminate the employment of the petitioner, Don Huddleston, formerly a tenured Chicago Public School (CPS) music teacher, after an administrate hearing from which the Board adopted the hearing officer's findings that the petitioner's conduct in striking ten-year-old special education student, Frank S. (hereinafter Frank) in the face was irremediable. The petitioner has sought judicial review of the Board's termination decision directly to this appellate court pursuant to section 34-85(a)(8) of the Illinois School Code (School Code) (105 ILCS 5/34-85(a)(8) (West 2016)) and Illinois Supreme Court Rule 335 (eff. July 1, 2017). On appeal, the petitioner argues that the hearing officer's findings that he struck Frank, causing him to bleed, and that such conduct was irremediable both *per se*, and under the standard articulated in *Gilliand v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 153 (1977), was against the manifest weight of the evidence. Accordingly, the petitioner contends that the Board had no authority to terminate his employment without prior warning. For the reasons that follow, we confirm the Board's findings.

¶ 3                                  I. BACKGROUND

¶ 4        The record before us includes the following relevant facts. The petitioner was a tenured music teacher with over 20 years of experience with CPS (mostly with high school students). At the time of the incident in December 2015, he had had been working at Madison Elementary School (Madison) for only one year. The student body of Madison is primarily African American, 98% low income, with 34% mobility.

¶ 5        On August 8, 2016, the Chief Executive Officer (CEO) of CPS, Janice K. Jackson, notified the petitioner in writing that she had approved 18 dismissal charges against him, *inter alia*, for his numerous violations of CPS corrective action categories, CPS Board rules and resolutions, a CPS policy regarding physical intervention for students with disabilities, the CPS student code of

conduct, the Madison faculty handbook, and several Illinois Board of Education (ISBE) rules. The majority of these concerned the prohibition against: (1) corporal punishment, physical abuse, humiliation; and (2) isolated time-outs for students.

¶ 6    With respect to these charges, the CEO set forth the following relevant "specifications."  On December 16, 2015, while assigned to Madison, the petitioner: (1) punished several students (including: ten-year-old male special education student, Frank, eleven-year-old male student, Terrell B. (Terrell), nine-year-old male student Marvin M. (Marvin), and ten-year-old male student, Pharrell L. (Pharrell)) by putting them outside of his classroom in the hallway during instructional time; (2) refused to let Frank reenter the classroom and/or attempted to close the classroom door so that Frank could not reenter; (3) pushed Frank on his chest to keep him from reentering the classroom; (4) slapped and/or hit Frank on his face; and (5) caused Frank to bleed from his face.  In addition, the charges specified that during the 2015-2016 school year, the petitioner was insubordinate because he continued to put students in the hallway during instructional time and/or to discipline and punish them even after the school administrator had repeatedly directed him (in person and in writing) not to place students in the hallway or use physical force against them.  The charges further alleged that the petitioner's misconduct had placed both CPS and Madison in a bad light.

¶ 7    On October 24, 2017, pursuant to section 34-85 of the School Code  (105 ILCS 5/34-85 (West 2016)), a tenured teacher administrative dismissal hearing was held before ISBE hearing officer Brian Clauss, at which four witnesses testified and 22 exhibits were entered into evidence.

¶ 8    At that hearing, Frank first testified that in December 2015, he was ten years old and in

fourth grade at Madison. The petitioner was Frank's music teacher. The music class combined fourth and fifth grade students and met twice a week. According to Frank, during music class, the boys sat on one side of the classroom and the girls on the other, and Frank usually joined the girls. He explained that there was often fighting and disruption both in the petitioner's classroom and throughout the school. Frank stated that the petitioner would put him into the hallway "almost every class." He acknowledged that the petitioner would then call security using a call button located inside the classroom adjacent to the classroom door, and have Frank be taken to the principal's office. Frank explained that this happened when the classroom was "loud" or "kids were acting bad," or there was "a fight." He averred that he would be taken out of the classroom even when he was not responsible for the misbehavior, while other kids, who were responsible, remained inside. This made him angry.

¶ 9    Frank testified that on December 16, 2015, the music classroom was "noisy." Several students were "playing" with a boy named Marvin. They took his shoes off and were throwing them around the classroom. The petitioner tried to calm the students down but was unsuccessful. At this point, another student began "spitting balls" at Marvin, and one of those spitballs hit the petitioner in the back of the neck. When Frank saw this, he laughed "real hard," and the petitioner, believing him responsible, grabbed Frank by his right wrist and led him to the hallway. Frank testified that there were already two other students in the hallway and that he was the third one taken out of the classroom that day.

¶ 10    Frank stated that he attempted to reenter the classroom and grabbed and pulled at the door handle. According to Frank, the petitioner "punched him," or "hit him with a closed hand" on the upper lip, causing it to bleed. Frank spit out blood. He was so enraged by being hit that he grabbed a desk that was outside of the classroom and slammed it against the classroom door. At

4

that point, the school's restorative practice coach, Skye Bierton (Bierton), appeared in the hallway and led him away from the classroom and outside of the building, asking him to breathe and calm down. Frank was subsequently taken to the principal's office and asked to write down what had occurred.

¶ 11    In his handwritten statement, which was entered into evidence at the hearing, Frank noted that because students were throwing Marvin's shoes the petitioner put three of them outside of the classroom. Frank further noted that he "tried to go back in," but the petitioner "slapped" him. Frank "got mad and threw the desk into the door," before "Bierton came downstairs and took [him] outside to clam [him] down."

¶ 12    Frank testified that he cried after the incident and did not want the petitioner to be his teacher because he did not want the same thing happening again.

¶ 13    Another Madison student, Martez next testified that on December 16, 2015, he was a fourth grader in the petitioner's music class and Frank's friend. Martez stated that he had been given permission by the petitioner to use the bathroom and was outside of the music classroom when the incident began. Upon heading back to the classroom Martez saw Frank in front of the music room, pulling at the door handle and shouting at the petitioner to let him back inside. Martez could see the petitioner inside the classroom because the top half of the door was made of glass. Martez heard the petitioner telling Frank to stop pulling the door, and Frank responding, "Stop talking to me." According to Martez, the petitioner then opened the door, hit Frank in the mouth and closed the door again. Frank began to cry, and said he was "tired of this school." He then walked to the water fountain stood there a few minutes, turned around, grabbed a desk and threw it at the classroom door. Martez averred that he was about eight feet away from Frank and the petitioner when he observed this incident. Martez testified that when Bierton appeared and took

Frank to the principal's office, the petitioner permitted him back into the classroom. Martez was asked to speak to the principal later that day and wrote down a statement.

¶ 14     His handwritten statement, which was introduced into evidence at the hearing, reads in full: "I[,] Martez W. saw the music teacher smack Frank and slam the door in his face[.] Frank spit on the floor[;] his spit was red and Frank start crying. [*sic*]" Martez testified that after this incident, he did not want the petitioner to be his teacher because he did not want the same thing happening to him.

¶ 15     Madison's former restorative practice coach, Skye Bierton, next testified that on December 16, 2015, she was sitting upstairs in the assistant principal's office working one-on-one with a student, when she heard Frank's voice escalate and a crash against a wall. She ran downstairs to find Frank outside of the music classroom, with a desk he had thrown on the ground next to the door. According to Bierton, the petitioner was inside the classroom with the majority of the students, and he was holding the door closed. Bierton testified that Frank was "extremely upset," so she put her arms around him, and walked him to a nearby exit. Frank appeared angry, and as if he was "defending himself," continued to repeat, "He hit me, he hit me." Bierton asked Frank what happened, and Frank told her that the petitioner had hit him. Bierton took Frank to the principal's office and then interviewed three students about the incident. According to Bierton, the students "pretty much [said] the same thing," and their "stories aligned," in that the petitioner had hit Frank in the face. When Bierton asked the students to reenact what happened, they showed her the petitioner "backhand[ing]" Frank.

¶ 16     Bierton testified that she did not see any blood on Frank's face but that she photographed the blood she discovered in front of the classroom door and sent it to the principal. That photo was admitted into evidence.

¶ 17    Bierton also testified that she could not think of any reason why Madison students would want to get the petitioner into trouble.

¶ 18    Principal Alaina Moore next testified that 2015 was her first year as acting principal at Madison. She stated that the school had been through "traumatic experiences" and that for safety reasons, she did not want any children alone and unsupervised at any time. Moore explained that as a result, in writing the 2015-2016 staff handbook for teachers she specifically included, among other things, the following statements in capital letters: "DO NOT PUT STUDENTS IN THE HALL OR SEND THEM TO THE OFFICE AS A METHOD OF DISCIPLINE! ALL STUDENTS HAVE A LEGAL RIGHT TO EDUCTAION." The handbook also included the following statement: "DO NOT USE CORPORAL PUNISHMENT." According to the handbook, any violations of this policy would "result in disciplinary action."

¶ 19    Moore testified that the petitioner signed a copy of the staff handbook and thereby acknowledged having read it. She also indicated that prior to December 16, 2015, she had several conversations with the petitioner about not taking students out of the classroom without supervision, and referred him to the staff handbook. In addition, on November 2, 2012, she emailed him noting that this was the second time it was reported that students from his classroom were running around the hallways unsupervised.

¶ 20    Moore next averred that on November 23, 2015, she emailed the petitioner regarding a separate incident involving a physical confrontation in his classroom and asking him to meet her to discuss the issue. The email was introduced into evidence and Moore testified regarding its substance. She stated that a school counselor who services a sixth grade student, L.B., reported to her that on that date, during music class L.B. and a few other students were talking. When

L.B. got up without permission to speak to another student, the petitioner asked L.B. to sit down, and then grabbed L.B. by the left arm and shoved him in his seat, shouting "sit down."

¶ 21          Moore next testified regarding the December 16, 2015, incident involving Frank. She stated that she was in her office when a parent opened the door and informed her that something was happening "down the hall." When Moore went into the hallway, she could hear a commotion in front of the music classroom where Bierton was standing with several students. As Moore approached the classroom, she saw petitioner inside, with his back to the door. Moore had to knock twice before the petitioner would turn around and allow her inside. According to Moore, as the petitioner opened the door, the students started yelling, "He hit Frank, he hit Frank." Moore testified that the children were visibly upset and that she tried to calm them down. She then asked a few students standing out in the hallway what had happened and they all said that the petitioner had hit Frank. Moore also noticed an overturned desk and some blood on the floor next to the classroom and Bierton comforting Frank.

¶ 22          Moore testified that Frank appeared to be very upset and just kept repeating, "He hit me, he hit me." Moore instructed Bierton to bring Frank to her office after he calmed down. About 30 minutes later, she spoke to Frank, who sat in her office crying and rocking back and forth. Frank told her that he was kicked out of the classroom "because of paper planes and shoes being tossed around." He also told Moore that when he tried to go back inside the classroom because he did not want to be outside in the hallway alone, the petitioner punched him in the mouth.

¶ 23          Moore stated that after speaking with Frank she also spoke with several students, including Martez, Marvin, Mikhil, Shantise, and LaTonya, and that all of their accounts were consistent with Frank's that the petitioner had hit Frank. Moore explained that as a result, she had the petitioner removed from the premises and reported the incident to DCFS.

¶ 24    Moore also testified about the impact that the incident had on Frank and the other students. She averred that Frank appeared nervous and expressed that he did not want to come back to school because he was scared. Frank's mother was very upset about the incident and wanted to sue the school. In addition, many other students began saying that they hated music, and, without a staffed music instructor, Moore was forced to come up with innovative ways to "bring back their love of the arts."

¶ 25    Moore also testified that CPS conducted its own investigation of the December 16, 2015, incident. That investigative report was prepared by Janette Ramirez of Arc Light and was introduced in its entirety as an exhibit at the administrative hearing.

¶ 26    According to the report, Ramirez interviewed: (1) Moore; (2) Frank; (3) Martez; and (4) Bierton, whose statements to her were all consistent with their testimonies at the administrative hearing. In addition, Moore told Ramirez that immediately after the incident, she observed Frank spit out blood in the main office sink. Also, Martez told her that while he observed the petitioner slap Frank on his face, he did not believe that the petitioner caused Frank to bleed and instead stated that Frank was "lying he bust his own mouth."

¶ 27    As part of her investigation, Ramirez also interviewed: (1) another student, Pharrell; (2) Madison's security guard, Christopher Stephens; (3) volunteer parent, Tarrah Avery (Avery); and (4) the petitioner. Her report found that Pharrell's, Stephens' and Avery's descriptions of the incident to her were consistent with their handwritten statements given to Moore immediately after the incident.

¶ 28    According to Ramirez, during his interview, Pharrell told her that on the date of the incident, while inside the music classroom, students Terrell and Martez were bullying Marvin because Marvin had taken his shoes off. The petitioner asked Frank, Terrell and Martez to go into the

9

hallway. According to Ramirez, Pharrell stated that Frank then attempted to reenter but that the petitioner resisted. Pharrell explained that the petitioner had a ring on his left hand and that he "back smacked Frank on his mouth to not let him in class." Pharrell saw that Frank began to spit blood and that he became upset, before sliding a desk into the classroom door. Pharrell then saw Bierton and the security guard, Stephens, arrive on the scene.

¶ 29    According to Ramirez, during his interview, security guard, Stephens, told her that on December 16, 2015, he was called to sit in on the petitioner's classroom immediately after the incident. While Stephens did not witness the incident itself, several students in the classroom told him that they saw Frank run into the door and hit his mouth as the petitioner was attempting to close it. Stephens also told Ramirez, however, that other students claimed that they had seen petitioner hit Frank in the mouth.

¶ 30    According to Ramirez, during her interview, parent volunteer Avery stated that she had been called via walkie-talkie to assist in the petitioner's classroom because several students, including Frank, were being disruptive (by throwing paper airplanes and shoes). When Avery arrived in front of the classroom, Frank, Pharrell, Terrell, and Martez were standing outside, and Frank was pulling at the classroom door while the petitioner was attempting to shut it. Avery told Ramirez that she turned around in order to find the security guard on duty (Stephens), when she heard Frank yell "you motherfucker you just him me in my face." When Avery turned around again, she saw Frank spitting blood on the floor and grabbing a desk from the hallway and slamming it into the classroom door. Avery told Ramirez that she had never seen Frank behave this way and that she sought help because she did "not want to touch him."

¶ 31    In her investigative report, Ramirez also summarized her interview with the petitioner.

According to Ramirez, the petitioner acknowledged that he told Frank and Terrell to go into the hallway because they were being disruptive. The petitioner, however, denied grabbing any of the students or leading them to the door by force. The petitioner also told Ramirez that even though he was instructed to remain outside, Frank continued to run inside and outside of the classroom, while the petitioner proceeded to buzz the main office for assistance. In order to end Frank's disruption of the class, the petitioner then attempted to close the door, but Frank held onto the door knob. The petitioner acknowledged that they "tussled with the door for a few minutes" and that he "put [his] hand on Frank's chest to get him away from the door." The petitioner directed Frank to stop and let go of the door knob. According to the petitioner, Frank eventually let the door go, but then began to bang on it with a desk. The petitioner denied ever slapping or smacking Frank on or near his face. He told Ramirez that Frank may have banged himself on the door knob or door when they were tussling with it. The petitioner also told Ramirez that Frank misbehaves in his classroom most of the time and that he is assigned an aide, but that on this date the aide was not in the classroom.

¶ 32    Based on the aforementioned interviews, Ramirez concluded that there was credible evidence to support the allegations that the petitioner: (1) pushed Frank on his chest in an attempt to keep him from reentering the classroom; and (2) slapped Frank on the face which caused him to bleed.

¶ 33    After CPS presented its evidence at the administrative hearing, the petitioner testified on his own behalf. The petitioner stated that he had over 25 years of teaching experience of which only a few were with elementary age students. 2015 was his first year teaching music at Madison. The petitioner acknowledged that prior to December 16, 2015, Moore had instructed him not to put students out into the hallway. The petitioner testified that he was instructed to use the call button inside the classroom to ask for assistance, but claimed that there was no response when he

11

did. The petitioner averred that Frank was often disruptive in class, and that he had to place him outside about two or three times a month. He explained that Frank had a "way of intimidating other students by throwing and pulling things" and being very "active." The petitioner further averred that Frank had an aide, who followed him to all of his classes and with whom the petitioner had worked in the past in an attempt to engage him and help him be less disruptive. On the date of the incident, however, the aide was not with Frank.

¶ 34    According to the petitioner, on December 16, 2015, Frank was throwing paper planes and shoes at his classmates before another student approached him and the two began tussling. The petitioner stated that he approached Frank, grabbed him by the arm, and told him that he had to leave. The petitioner escorted Frank, who was jerking and trying to get away from him, out of the classroom and then closed the door. He hit the call button for the office seeking assistance. The petitioner testified that it was his intent to have Frank stand outside and breathe before he would approach him again and ask him whether he was ready to rejoin the class. According to the petitioner, however, Frank was irate and began pulling on the door. The petitioner explained that he did not want Frank coming into the classroom in such a state, so he pulled the door back and kept it shut, hoping that assistance would arrive from the principal's office. The petitioner stated that at some point, Frank began yelling that the petitioner had "made [him] bleed," and then shoved a desk into the classroom door.

¶ 35    The petitioner denied ever striking Frank in any way. He stated that any kind of physical contact between the two of them was impossible because during the entire incident they were on opposite sides of the classroom door.

¶ 36    The petitioner admitted that there was a DCFS investigation into his actions but claimed that he was cleared of all physical abuse charges.

¶ 37    Based on the aforementioned evidence, the administrative hearing officer determined that the petitioner struck Frank in the face causing him to bleed.  In this respect, the hearing officer noted that while the petitioner's and Frank's testimonies were in substantial agreement about the classroom being disrupted, Frank being sent into the hallway, and the petitioner holding the door to prevent his return, they differed on whether the petitioner struck Frank.  The hearing officer found that Frank's testimony was more credible because it was corroborated by the testimonies of "a student [Martez], staff member [Bierton], principal [Moore], and a classroom of students."

¶ 38    The hearing officer therefore held that the petitioner's conduct was *per se* irremediable because it was cruel, criminal and caused both physical and psychological harm to Frank. In addition, the hearing officer found that the petitioner's conduct was irremediable under the *Gilliand* test because it caused harm to both Frank and to Martez, who saw his classmate injured, and did not want to return to the petitioner's class for fear of being struck himself.  The hearing officer further found that a warning would not have corrected the petitioner's conduct because the petitioner had been on prior notice that corporal punishment was strictly prohibited by CPS and nonetheless engaged in it. Accordingly, the hearing officer recommended that CPS terminate the petitioner's employment immediately.

¶ 39    On July 25, 2018, the Board adopted the hearing officer's factual findings, legal conclusions and recommendation to terminate the petitioner as a tenured CPS teacher, and dismissed him from his employment.  After the Board rejected the petitioner's exceptions to its findings, the petitioner appealed directly to this court.

¶ 40                                II.  ANALYSIS

¶ 41    On appeal, the petitioner makes several contentions of error regarding the Board's

termination of his employment. Before addressing these contentions we first set forth a brief overview of the termination proceedings for tenured teachers. Under the School Code, for cities with over 500,000 inhabitants, which includes the city of Chicago, no tenured teacher may be removed except for "cause." 105 ILCS 5/34-85(a) (West 2016). Although the School Code contains no definition of "cause," our courts have described it as "that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness" (*Raitzik v. Board of Education of City of Chicago*, 356 Ill. App. 3d 813, 831 (2005)) or "something which the law and sound public opinion recognize as a good reason for the teacher to no longer occupy his position" (*McCullough v. Illinois State Board of Education*, 204 Ill. App. 3d 1082, 1087 (1990)). Pursuant to the School Code, even where the tenured teacher is removed for "cause," if the teacher's conduct is deemed remediable rather than irremediable, the teacher cannot be terminated without prior warning, and any such termination by the Board is invalid. 105 ILCS 5/34-85(a) (West 2016).

¶ 42       To initiate dismissal proceedings for "cause," the CPS CEO, as the local superintendent, must approve the charges and specifications against the tenured teacher. 105 ILCS 5/34-85(a)(1) (West 2016). Within 10 days of that approval, the teacher must be served with written notice of the charges and specifications against him. *Id*. Thereafter, the teacher may request a hearing before a mutually selected hearing officer. 105 ILCS 5/34-85(a)(2)-(3) (West 2016). In consultation with the Chicago Teachers Union, the Board must maintain a list of at least nine qualified hearing officers, all of whom must possess certain training and experience requirements. 105 ILCS 5/34-85(a)(3) (West 2016). The teacher and the superintendent rotate striking hearing officers until one remains. *Id*. That officer presides over the teacher's dismissal hearing and determines whether CPS has proved by a preponderance of the evidence the

specifications and charges supporting dismissal. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 53.

¶ 43        Following the hearing, the hearing officer reports his findings and makes a recommendation as to whether or not the teacher should be dismissed to the superintendant. 105 ILCS 5/34-85(a)(6) (West 2016). Afterwards, the Board has 45 days to make its decision. 105 ILCS 5/34-85(a)(7) (West 2016). Under section 34-85(a)(8) of the School Code (105 ILCS 5/34-85(a)(8) (West 2016)), a dismissed teacher may seek judicial review of the Board's decision directly to this court, and such a review is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)).

¶ 44        On review, we generally assess the decision of the Board and not that of the hearing officer. However, where, as here the Board merely approves and adopts the decision of the hearing officer in whole without supplementing the findings, "the Board's decision is a mere proxy for that of the hearing officer," and we essentially review the findings of the hearing officer for error. *Russell v. Board of Education of the City of Chicago*, 379 Ill. App. 3d 38, 46 (2007).  In assessing such errors, our standard of review is dependent upon whether the question presented is one of fact, one of law, or a mixed question of law and fact.  *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).  Findings of fact are considered *prima facie* true and correct (735 ILCS 5/3-110 (West 2016)), and can be reversed only when they are against the manifest weight of the evidence. *Beggs*, 2016 IL 120236, ¶ 50.  A finding is against the manifest weight of the evidence where an opposite conclusion is clearly evident or when the "findings appear to be unreasonable, arbitrary, or not based on the evidence." *Vancura v. Katris*, 238 Ill. 2d 352, 385-86 (2010).  In contrast, questions of law are reviewed under a *de novo* standard, and mixed questions of law and fact are reviewed under the clearly erroneous

standard. *Beggs*, 2016 IL 121236, ¶ 50. A mixed question of fact and law examines the legal effect of a given set of facts (*i.e.*, whether the facts satisfy the statutory standard or whether the rule of law, as applied to the established facts, is or is not violated). *Id.* A decision will be deemed clearly erroneous where the reviewing court is "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.*

¶ 45       With these principles in mind, we turn to the petitioner's contentions. The petitioner first argues that the hearing officer's finding that he struck Frank in the face, causing him to bleed, was against the manifest weight of the evidence. After a thorough review of all of the evidence presented at the administrative hearing, we disagree.

¶ 46       It is well-settled that in an administrative hearing, the hearing officer acts as the trier of fact. See *Gernaga v. City of Chicago*, 2015 IL App (1st) 130272, ¶ 13. Pursuant to this role, it is the hearing officer's responsibility to observe and listen to the witnesses, determine their credibility, assign weight to their testimony, resolve conflicts in contradictory statements, and draw reasonable inferences from the evidence. See *Gernaga*, 2015 IL App (1st) 130272, ¶ 13; *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 162 (2006); *Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 542 (2010). As the reviewing court, we must defer to these findings. *Id.*

¶ 47       In the present case, multiple witnesses testified that the petitioner hit Frank, that Frank was bleeding, and that there was blood on the floor outside of the petitioner's classroom. Specifically, Frank testified that the petitioner punched him in the mouth causing him to bleed. Martez directly corroborated this testimony by stating that upon his return from the bathroom he observed the petitioner hit Frank in the mouth with his fist. Both Frank and Martez testified that Frank cried afterwards and that he was upset enough to throw a desk at the classroom door. Both

also testified that because of the petitioner's actions they did not want him to continue being their teacher because they were afraid of being hit.

¶ 48     Two additional witnesses, Bierton and Moore, testified to arriving at the petitioner's classroom immediately after the incident. Bierton averred that from an upstairs office, she heard Frank's voice escalate and a "crash." She ran downstairs and observed that Frank was "extremely upset," crying and angry, and that he kept repeating that the petitioner had hit him. In addition, Bierton observed blood on the floor outside of the petitioner's classroom, which she photographed.

¶ 49     Moore testified that she heard a commotion, and that when she arrived at the petitioner's classroom she observed an overturned desk and blood on the floor. The petitioner was holding the door of the classroom closed and she had to knock twice before the petitioner turned around and permitted her inside. Moore also observed Frank, who was with Bierton, and testified that he appeared to be very upset. Frank told Moore that he got hit. When, about 30 minutes later, Bierton spoke to Frank in her office, he was crying and rocking back and forth, and told her that the petitioner had hit him.

¶ 50     Additionally, both Moore and Bierton testified that Frank's allegation about being struck by the petitioner was corroborated by several other students with whom they spoke at the scene. Moore also testified that when she entered the petitioner's classroom after the incident, the students inside at once began shouting that "he hit Frank." According to Moore, these students were "upset" and appeared to be under "stress or excitement about what [had] happened."

¶ 51     Under this ample evidence, we find nothing arbitrary or unreasonable in the hearing officer's findings. Accordingly, we find that the hearing officer's conclusion that the petitioner struck Frank in the face, causing him to bleed was not against the manifest weight of the evidence.

¶ 52    The petitioner nonetheless asserts that the hearing officer's findings are manifestly erroneous, because Frank's and Martez's accounts were directly contradicted by his own credible statement that he never struck the petitioner. In addition, the petitioner asserts that Frank's and Martez's credibility is beleaguered by numerous inconsistencies in their testimonies and the statements they originally gave to Moore and Ramirez. Specifically, the petitioner points out that while Frank testified that the petitioner "hit him with a closed hand" on the upper lip, he originally told Moore that the petitioner only "slapped" him. The petitioner similarly points out that while Martez testified that he saw the petitioner hit "Frank in the mouth" with his right fist, he formerly told Moore that he saw the petitioner "slam the door in Frank's face," and Ramirez that while the petitioner "slapped" Frank, he did not believe that the petitioner made Frank bleed, and instead Frank "bust his own mouth." For the reasons that follow, we disagree.

¶ 53    We first note that at the administrative hearing, the petitioner never attempted to impeach either Frank or Martez with any of these alleged inconsistencies in their prior statements. Moreover, both of the students' handwritten statements and their summarized interviews with Ramirez were introduced as exhibits at the administrative hearing, without any objections from the petitioner. As such, they were part of the evidence, and could have been used by the petitioner to impeach Frank and Martez. In addition, as part of the record they were available to and were presumably reviewed by the hearing officer in making his findings. As such, even with these allegedly inconsistent statements before him, the hearing officer nonetheless found Frank's and Martez's version of the incident more credible than that of the petitioner. Since "determinations as to the weight of evidence and the credibility of witnesses are matters within the province of" the hearing officer any alleged "[c]onflicts in witness testimony" are for the trier of fact to resolve and will "not constitute a sufficient reason to reverse the administrative

agency's decision." (Internal quotations omitted.) *Orsa v. Police Board of City of Chicago*, 2016 IL App (1st) 121709, ¶ 47. The mere fact that a conclusion opposite to the one reached by the agency is reasonable or that we, as the reviewing court, would have ruled differently will not justify reversal. *Id.* Accordingly, we find nothing manifestly erroneous in the hearing officer's credibility ruling in favor of Frank.

¶ 54    We similarly find no merit in the petitioner's contention that in making his credibility determinations, the hearing officer improperly relied on hearsay statements by students as reported by Moore and Bierton that the petitioner hit Frank. In this respect, the petitioner maintains that because the outcome of the hearing was dependent on a credibility determination, the hearing officer should not have been permitted to rely on unsworn out-of-court declarations of nontestifying witnesses. The petitioner claims that the inclusion of such testimony violated his due process right to confront and cross-examine the witnesses against him. In support, he cites to the decisions in *Colquitt v. Rich Township High School District No. 227*, 298 Ill. App. 3d 856 (1998) and *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436. For the reasons that follow, we disagree and find those cases inapposite.

¶ 55    At the outset, we note that the petitioner waived this argument by failing to object to either Bierton's testimony regarding her accounts of other witnesses, or Moore's testimony regarding what the students yelled at her upon her entrance into the petitioner's classroom, both at the administrative hearing, and in the exceptions he subsequently filed with the Board. See *Pesoli v. Department of Employment Security*, 2012 IL App (1st) 111835, ¶ 23 ("It is well settled that if an argument, issue, or defense is not presented in an administrative hearing it is procedurally defaulted and may not be raised for the first time on administrative review.") Similarly, the petitioner failed to object to the introduction of the any of the students' handwritten statements or

Ramirez's notes as to her interviews with those students as evidentiary exhibits at the administrative hearing. See *Perez v. Illinois Concealed Carry Licensing Review Board*, 2016 IL App (1st) 152087, ¶ 23 ("[W]hen hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect.")

¶ 56    What is more, in challenging Frank's and Martez's credibility and arguing that the hearing officer's findings were against the manifest weight of the evidence, the petitioner himself now relies on similar out-of-court hearsay statements made by Madison's security guard, Stephens, as to what certain students told him transpired during the incident (*i.e.*, that Frank injured himself). As such, the petitioner's argument is at best disingenuous.

¶ 57    Regardless, turning to the merits, we note that while the petitioner is correct when he points out that procedural due process precludes the admission of hearsay evidence in administrative proceedings, our courts have repeatedly held that "where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error. [Citations]" (Internal quotation marks omitted). *M. F. Booker v. Board of Education of the City of Chicago*, 2016 IL App (1st) 151151, ¶ 70; *Abrahamson v. Illinois Department of Professional Regulations*, 153 Ill. 2d 76, 94 (1992); *Goranson v. Department of Registration & Education*, 92 Ill. App. 3d 496, 501 (1980). Additionally, "the strict rules of evidence that apply in a judicial proceeding are not applicable to proceedings before an administrative agency." *M. F. Booker*, 2016 IL App (1st) 151151, ¶ 70; see also 23 Ill. Adm. Code 51.60(d)(2), amended at 36 Ill. Reg. 12829 (eff. July 25, 2012) ("The hearing officer shall be the judge of the relevancy and materiality of the evidence offered and strict conformity to legal rules of evidence shall not be necessary.")

¶ 58    In the present case, the hearing officer's credibility determination in favor of Frank was based

upon the testimony of four witnesses, Frank, Martez, Bierton and Moore, only two of whom separately referred to statements made to them by other, non-testifying, students. Frank and Martez, who were both present for the entire incident, affirmatively stated that the petitioner hit Frank, and that this caused his lip to bleed. Evidence of the injury was corroborated by Bierton and Moore, both of whom saw blood on the floor in front of the petitioner's classroom, and by the photograph introduced into evidence depicting that blood. Moreover, the testimonies of all four witnesses were corroborated either by handwritten statements that they made immediately after the incident and/or their interviews with Ramirez. The veracity of those prior statements was subject to scrutiny, since all four witnesses testified at the hearing and were available for cross-examination. Accordingly, regardless of any improperly considered non-testifying witness statements, the competent testimony of Frank and Martez that the petitioner struck Frank, and Moore's and Bierton's competent testimony regarding seeing and documenting the blood in front of the petitioner's classroom, alone were sufficient to support the hearing officer's finding that the petitioner hit Frank causing his injury. Any references by Moore and Bierton to their conversations with non-testifying students at the scene were at best cumulative of and superfluous to the testimony already offered by Martez and Frank. As such, these references were not prejudicial. See *M. F. Booker*, 2016 IL App (1st) 151151, ¶ 70.

¶ 59       In this respect, we find that *Colquitt* and *Kimble* do nothing to bolster the petitioner's argument. In *Colquitt*, a student sought review of the Board of Education's decision to expel him due to a verbal confrontation between the student and three other students. *Colquitt*, 298 Ill. App. 3d at 857-58. The three other students, with whom he had a confrontation, were not present at the hearing, but their statements were admitted into evidence over the objection of the expelled student's attorney. *Id*. at 858. On appeal, the expelled student argued that the admission of these

statements denied him due process by denying him the right to confront and cross-examine his accusers. *Id*. at 864. The appellate court agreed, noting: "[T]he only accusing witnesses against [the expelled student] who allegedly observed the entire incident were not even present at the hearing. Here, the outcome of the hearing was directly dependent on the credibility of witnesses whose statements were received by the hearing officer; yet, these statements were conflicting. In such an instance, the opportunity for cross-examination is imperative." *Id*.

¶ 60     Similarly, in *Kimble*, a tenured teacher was accused of corporal punishment of a student who did not testify at the teacher's dismissal hearing. *Kimble*, 2014 IL App (1st) 123436, ¶ 84. None of the witnesses present at the hearing observed the entirety of the alleged corporal punishment. *Id*. The court held that it was unjust to terminate the tenured teacher's employment without giving her the opportunity to cross-examine her accuser. *Id*. Accordingly, the court concluded that such a procedure failed to comport with due process. *Id*.

¶ 61     Unlike in *Colquitt* and *Kimble*, where neither accused had an opportunity to confront or cross-examine his or her accusers, in the present case, the accusing witness, Frank, testified as to the entirety of the incident at the administrative hearing and was cross-examined thoroughly by the petitioner's counsel. Moreover, here, an additional eyewitness, Martez, testified and was cross-examined at the hearing and corroborated Frank's account of being struck. Frank's account was further bolstered by Moore and Bierton both of whom testified about their interactions with Frank, his state of mind, and his statements to them immediately after the incident. Accordingly, since the petitioner's attorney was able to cross-examine all of four witnesses, whose competent testimony was indispensible to the outcome of the hearing, we find that "the requirements of due process were satisfied." *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 76.

¶ 62     The petitioner next argues, albeit inartfully, that the Board lacked sufficient "cause" to

22

discharge him from his employment.  We disagree.

¶ 63        As already noted above, the authority to dismiss a tenured teacher lies in section 34-85 of the

School Code (105 ILCS 5/34-85 (West 2016)), which provides that no tenured teacher shall be

removed except for "cause."  As explained above, our courts have held that "cause" connotes

"that which law and public policy deem as some substantial shortcoming which renders a

teacher's continued employment detrimental to discipline and effectiveness" (*Raitzik*, 356 Ill.

App. 3d at 831) or "something which the law and sound public opinion recognize as a good

reason for the teacher to no longer occupy his position" (*McCullough*, 204 Ill. App. 3d at 1087).

In the present case, CPS was required to prove by a preponderance of the evidence the existence

of "cause" for the petitioner's dismissal.  *Beggs*, 2016 IL 120236, ¶ 53.  The existence of

sufficient "cause" is a question of fact for the Board to determine and is reviewed under the

manifest weight of the evidence standard. *Fadler v. Illinois State Board of Education*, 153 Ill.

App. 3d 1024, 1026 (1987).  Accordingly, we will not disturb the Board's finding of "cause"

unless an opposite conclusion is clearly evident from the record. *Id.*

¶ 64        CPS here charged the petitioner with violations of several corrective action categories

including, among other things: (1) the prohibition against corporal punishment, including

physical punishment, humiliation and isolated time outs; (2) the prohibition against physical

abuse; (3) the prohibition against negligent performance, *i.e.*, the failure to act in the manner of a

reasonably prudent educator in supervision of students; (4) the prohibition against failing to

follow CPS policies concerning students, and to carry out a directive from a supervisor.  In

addition, CPS charged the petitioner with violating Chicago Board of Education Rule 6-21,

which prohibits corporal punishment.  CPS also charged the petitioner with violating Madison's

faculty handbook which prohibits corporal punishment and putting students in the hallway to

discipline them. The petitioner was further charged with conduct unbecoming of a CPS employee.

¶ 65    In the present case, the record unequivocally establishes that the petitioner was aware that corporal punishment and unsupervised time-outs were prohibited on school premises, but that he nonetheless continued to engage in both. At the administrative hearing, Moore testified that prior to the December 16, 2015, incident, the petitioner had signed the Madison faculty and staff handbook, which explicitly prohibited both corporal punishment and putting students in the hallway. In addition, Moore testified that she personally reminded the petitioner not to violate these policies at least once prior to December 2015, after the petitioner's prior violations of the policy had been reported to her. The petitioner himself acknowledged that he was aware that CPS prohibits corporal punishment and that he had been repeatedly instructed not to place students in the hallway unsupervised. He also acknowledged that in hindsight he would have acted differently. Under this record, since we have already determined that there was ample evidence for the hearing officer to find that the petitioner hit Frank in the face, we must also conclude that there was sufficient evidence to support the Board's allegations of "cause" with respect to the petitioner's violation of the aforementioned CPS policies prohibiting corporal punishment and unsupervised time-outs. Accordingly, we find nothing manifestly erroneous in the Board's conclusion that there was "cause" for discharge. See *Board of Education of City of Chicago v. State Board of Education*, 100 Ill. App. 3d 897, 900-01 (1981) (holding that use of corporal punishment can constitute "cause" for dismissal).

¶ 66    The petitioner next contends that even if the Board had sufficient "cause" to discharge him, it

was nonetheless without authority to do so without first providing him with a written warning. In this respect, the petitioner contends that the evidence at the administrative hearing failed to establish that his conduct was irremediable. For the reasons that follow, we disagree.

¶ 67    Pursuant to section 34-85 of the School Code, where the alleged "cause" for termination is deemed remediable, the teacher must be given reasonable written warning notifying him of the alleged "cause" and that if he does not remediate the "cause," he may face dismissal charges. 105 ILCS 5/34-85 (West 2016). Where a teacher's conduct is deemed remediable, the Board has no authority to terminate him on that basis. *Jackson v. Board of Education of City of Chicago*, 2016 IL App (1st) 141388, ¶ 30. However, where the alleged "cause" for termination is based on conduct deemed irremediable, the teacher is not entitled to any written warning prior to the dismissal charges being brought and may be dismissed for such conduct. 105 ILCS 5/34-85(a) (West 2016); see also *Younge v. Board of Education of City of Chicago*, 338 Ill. App. 3d 522, 531-34 (2003).

¶ 68    Historically, to determine whether a teacher's conduct was irremediable, courts employed the two-part test of *Gilliland*, under which a teacher's conduct was deemed irremediable if: (1) damage was done to students, the faculty, or the school; and (2) the conduct could not have been corrected had superiors warned the teacher. *Gilliand*, 67 Ill. 2d at 153. However, in 1995, the School Code was amended to explicitly make certain types of conduct irremediable *per se*, thereby eliminating the need to apply *Gilliand* to those particular types of conduct. Pub. Act 89-15 (eff. May 30, 1995) (amending 105 ILCS 5/34-85(a)); see *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 86. Pursuant to amended section 34-85(a) of the School Code (105 ILCS 5/34-85(a) (West 2016)), conduct that is "cruel, immoral, negligent, or criminal or that *in any way causes* psychological *or physical harm or injury to a student*" is deemed irremediable, and the teacher is

not entitled to any written warning prior to the charges being brought. (Emphasis added.); see also *Younge*, 338 Ill. App. 3d at 534. In light of the amendment to the School Code, there are now two ways for conduct to be deemed irremediable: (1) *per se* by statute; or (2) under the standard articulated in *Gilliland. Id.* A showing on either one is sufficient cause for termination without warning. See *Id.* at 533-34. Whether conduct is irremediable is a question of fact, and we may not reverse the Board's finding on that question unless it was against the manifest weight of the evidence. *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 84.

¶ 69    In the present case, the hearing officer first concluded that the petitioner's conduct in striking Frank was irremediable *per se* because it was: (1) cruel; (2) criminal under Illinois law (even though it remains an uncharged assault); (3) caused physical harm to Frank where he was bleeding and in pain; and (4) caused psychological harm to Frank because he was afraid to return to the petitioner's classroom. The hearing officer further found that the petitioner's conduct was irremediable under *Gilliand* because in addition to causing harm to Frank, it caused harm to Martez, who watched his classmate being injured and who did not want to continue being taught by the petitioner for fear of being struck himself. The hearing officer found that since the petitioner had been already warned about not using physical punishment against students and not placing them in isolated time-outs in the hallway, under *Gilliand*, any prior warning would have proven futile and would not have corrected the petitioner's conduct. Since we have already held that there was ample evidence that the petitioner struck Frank with such force that it caused him to bleed from the mouth, we find nothing manifestly erroneous in these findings. *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 84.

¶ 70    In that respect, we disagree with the petitioner's contention that his conduct should be

considered remediable since there was no evidence offered at the hearing that Frank experienced any "significant" injury or "pain." Contrary to the petitioner's position, nothing in section 34-85 of the School Code requires CPS to prove that a student suffered significant physical harm or pain before a teacher's conduct can be considered irremediable *per se*. Rather, the statute broadly defines such conduct as that which "*in any way* causes \*\*\* physical harm or injury to a student." 105 ILCS 5/34-85(a) (West 2016). Section 34-85 puts no limitation on the type or extent of the harm or injury caused to the student.

¶ 71    Contrary to the petitioner's position, the fact that the School Code also requires teachers to "maintain discipline" and prohibits the Board from enacting policies that preclude teachers from using "reasonable force as needed to maintain safety for the other students" (105 ILCS 5/34-84a (West 2016)) in no way alters the breadth of section 34-85 (105 ILCS 5/34-85(a) (West 2016)). Rather, this merely permits the Board to weigh the reasonableness of a teacher's conduct in maintaining discipline through the numerous CPS policies in place at individual schools.

¶ 72    In the present case, the hearing officer clearly found that the petitioner's conduct in striking a ten-year old student on the face with such vigor so as to cause him to bleed, far exceeded the scope of any reasonable force necessary to maintain safety and/or discipline inside the school. In addition, the petitioner himself acknowledged at the hearing that he had been previously warned not to discipline his students by use of physical force or by placing them outside of the classroom in the hallway. As such, there is nothing manifestly erroneous in the hearing officer's finding that the petitioner's conduct caused "physical harm or injury" to Frank and was therefore *per se* irremediable under section 34-85 of the School Code (105 ILCS 5/34-85(a) (West 2016)). See *James v. Board of Education of City of Chicago*, 2015 IL App (1st) 141481, ¶ 21 (holding that a tenured high school teacher's negligent conduct in pretending to

27

throw a stapler at a disruptive student, which resulted in the stapler detaching from its cover and striking another student was *per se* irremediable under section 34-85(a) of the School Code, which provides for removal of teachers for "cause" and makes conduct causing a student physical harm *per se* irremediable); see also *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 82 ("Corporal punishment is an irremediable cause for dismissal.")  Accordingly, dismissal without notice was warranted.

¶ 73      Since we find that the petitioner's conduct was irremediable on these grounds we need not address the remainder of his arguments regarding remediability.

¶ 74                                    III.  CONCLUSION

¶ 75      For all of the aforementioned reasons, we find that the Board's decision to dismiss the petitioner without a written warning was not clearly erroneous under the specific facts of this case.  See *James*, 2015 IL App (1st) 141481, ¶ 21.  We therefore confirm the decision of the Board.

¶ 76      Confirmed.